GENERAL ELECTRIC CAPITAL CORP., Plaintiff–Appellant,

v.

SOUTHEASTERN HEALTH CARE, INC., and Prentiss E. Smith, Jr., Defendants–Appellees.

No. 90–3278.

United States Court of Appeals, Fifth Circuit.

Dec. 27, 1991.

Linton W. Carney, Richard W. Bussoff, Monroe & Lemann, New Orleans, La., for plaintiff-appellant.

Randall A. Smith, Marc D. Winsberg, Stone, Pigmann, Walther, Witmann & Hutchinson, New Orleans, La., for defendants-appellees.

Before BROWN, SMITH and WIENER, Circuit Judges.

WIENER, Circuit Judge:

This Louisiana diversity case involves a dispute arising from the lease of an aircraft (the Lease). The lessor, General Electric Capital Corporation (GECC), appeals the district court's grant of a summary judgment on motion of the lessee, Southeastern Health Care, Inc. (Southeastern), and its President, owner, and guarantor under the lease, Prentiss E. Smith, Jr., M.D. Finding that, before the instant suit was filed, Southeastern had complied with GECC's notice of default, the district court held that such compliance vitiated that notice, necessitating a new default as a prerequisite to suit. Based on that holding, the district court granted Southeastern's motion for summary judgment, denied GECC's counter motion for summary judgment, and dismissed GECC's suit. 734 F.Supp. 716. Disagreeing as a matter of fact with the district court's determination that Southeastern complied with GECC's notice of default, and disagreeing as a matter of law with the district court's prognostication that the Supreme Court of Louisiana would require "renotification" if the notice issue of this case were before it, we reverse and remand.

## I.

### FACTS AND PROCEEDINGS

In November, 1981, GECC and Southeastern entered into the Lease for a ten-

year term. The object of the Lease was a Beechcraft KingAir. Individually, Smith executed a guaranty agreement covering Southeastern's obligations under the Lease.

For the first several years of the Lease Southeastern met its obligations to the general satisfaction of GECC, but by early 1987, the situation had deteriorated to a point deemed unacceptable by GECC. By letter dated April 7, 1987 (the Notice), GECC formally advised Southeastern that GECC had "elected to institute the provisions of default" under the Lease and to "accelerate the account balance in accordance with the terms of the Lease." The Notice listed each item comprising the so-called "account balance," a term used in the Lease to mean the total delinquency thereunder: regular monthly installments for February and March of 1987, property taxes due under the Lease for calendar years 1986 and 1987, the monthly installment due on April 6th, sales tax on rental and on property taxes, late charges, and the aircraft's so-called "Casualty Value"—another term of art in the Lease. The Notice is annexed hereto as Appendix I.

On April 23, 1987, Smith responded to the Notice by letter, advising GECC that he realized he was behind on his payments under the Lease and that he fully intended to comply with the terms of the Lease within the year, as soon as his cash flow problems abated. Smith also stated that he would like to "work out something" with GECC so that he could continue to lease the aircraft. Shortly thereafter, Southeastern sent GECC two checks representing the delinquent installments for February and March of 1987. Apparently nothing was said about, and no payments were remitted to cover, the delinquent ad valorem tax payments, the April rent installment which by then was delinquent, or any of the other sums called for in the Notice. The two checks were not immediately deposited by GECC but instead were held until late in May of 1987.

On May 13 of 1987, while GECC was still holding checks for the February and March installments, representatives of GECC met with Smith as he had requested. Although there is some dispute as to what if anything was accomplished at the May 13th meeting, the parties stipulated that efforts to reach an accommodation proved unsuccessful. After the meeting GECC requested return of the aircraft and deposited the checks for the February and March installments. Southeastern returned the aircraft on June 19, 1987. After spending $39,-443.54 to put the aircraft in condition for sale, GECC sold it on the open market for $950,000.00. Thus, the proceeds recognized by GECC on the sale of the aircraft were $910,556.46.

GECC then filed the instant suit seeking a money judgment against Southeastern and Smith. GECC claimed that under the terms of the Lease, the net deficiency owed by Southeastern was $607,064.89, plus interest and attorneys' fees. Southeastern filed a motion for summary judgment and GECC filed a counter motion for summary judgment. The district court granted Southeastern's motion and dismissed GECC's lawsuit. The court held that GECC had failed to notify Southeastern of its default in accordance with required notification procedures. The district court did not specify whether the notification procedures to which it referred were those called for in the Lease or supplied by the law of Louisiana or both. It did find, however, that Southeastern's payment of the February and March installments, and GECC's negotiation of those payments, constituted compliance with the Notice, vitiating any further efficacy, and thereby making a renotification a prerequisite to suit. The district court also denied GECC's counter motion for summary judgment, and GECC timely filed a notice of appeal.

## II.

## ANALYSIS

### A. *Standard of Review.*

This court reviews the grant of summary judgment motion de novo, using the same criteria used by the district court in the

first instance.[1] We "review the evidence and inferences to be drawn therefrom in the light most favorable to the non-moving party."[2] Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[3] A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[4] "Material facts" are "facts that might affect the outcome of the suit under the governing law."[5]

■ Additionally, as this diversity case turns on the district court's interpretation of state law in an area not previously addressed by the highest court of the State, we must ensure that the district court's determination fully comports with the law and policies of Louisiana as the situs state. We therefore review the district court's interpretation of state law without affording any deference to that court's determination.[6]

B. *Partial Compliance with Notice; Renotification.*

■ The district court found that by remitting checks in April to cover the delinquent installments for February and March, Southeastern complied with GECC's demand contained in the Notice. Based on that determination, the district court held that GECC's suit was improperly filed because Southeastern's compliance with the Notice had nullified its future efficacy as a prerequisite to suit, thereby requiring a new putting in default—"renotification"—before litigation could be instituted.

In our de novo review, we find as a preliminary matter that if Southeastern complied with the Notice at all, it did so only partially. Even if we disregard the fact that the April installment was due by the time Southeastern purported to comply with the Notice, and accept the fact that the April installment was not delinquent when the Notice was mailed, Southeastern still complied only partially. Payments required under the Lease were not just the stated monthly installments. Rather, Southeastern as lessee was obligated to pay such costs, expenses and charges, as property (ad valorem) taxes on the aircraft, sales taxes on the rent and on the ad valorem taxes. Property taxes, sales taxes and late charges were among the delinquencies listed in the Notice, not to mention the Casualty Value of the aircraft. That Southeastern was delinquent in ad valorem taxes for two years, and for sales tax, at the time it received the Notice from GECC is undisputed. Clearly, payment of the delinquent monthly installments for February and March was, at most, a partial compliance with the Notice.

More significantly, as will be explored in greater depth below, the Notice was mischaracterized by the district court. It treated the Notice as a mere request by GECC that Southeastern "catch up" its delinquent rent. But both in fact and in law the Notice was GECC's exercise of one of its optional remedies under the Lease—termination coupled with recovery of possession of the leased aircraft and all sums accrued through the effective date of lease termination—including past due monthly installments, taxes, late charges, "liquidated damages" or "casualty value" of the plane, and the like. We believe that recognition of the true legal character of the Notice as an exercise of GECC's option to

---

**1.** *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988).

**2.** *Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir.1986) (per curiam) (citing *Southmark Properties v. Charles House Corp.* 742 F.2d 862, 873 (5th Cir.1984)).

**3.** Fed.R.Civ.P. 56(c).

**4.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

**5.** *Id.*

**6.** *See Allison v. ITE Imperial Corp.*, 928 F.2d 137, 138 (5th Cir.1991) (citing *Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1990)).

terminate the Lease and an amicable demand to the former lessee to comply with its remaining obligations—as distinguished from a mere notice to a lessee to make the Lease current or face the consequences—requires reversal of the district court's grant of Southeastern's motion for summary judgment. But, as the district court's decision involved substantial issues of Louisiana law, we are constrained to exhaust the legal matters thus implicated.

We agree with the district court that, as to Louisiana leases of immovable (real) property, the lessor's acceptance of even partial payment of rent in response to a formal demand for payment vitiates that demand totally. We do not agree, however, that it is more likely than not that the Supreme Court of Louisiana, when faced squarely with that issue in a case involving the lease of movable (personal) property—an issue not heretofore considered by that court—would conclude that the "renotification" rule would be equally applicable. Not one Louisiana case was cited by the litigants or by the district court—and none has been found by this court—addressing the "renotification" principle in the context of a lease of movables. In the absence of state authorities, our task is to predict whether Louisiana's highest court would extend the rule of renotification to leases of movables.[7] Because we find that Southeastern's compliance with the notice of default was only partial, the scope of our determination is limited to instances involving leases of movables in which the lessee partially complies with a notice of default from the lessor.

### C. Origins of the Renotification Rule.

The renotification rule is a creation of Louisiana jurisprudence. The rule has existed at least since 1950.[8] Neither the courts nor the legislature of Louisiana appear to have extended that rule to leases of movables despite at least two golden opportunities for the legislature to do so: first when it enacted the original Lease of Movables Law (the Act); and second in 1985 when the legislature replaced the original version of the Act with the current version.[9] As hereinafter analyzed, that Act contains no renotification rule; to the contrary, the substance of Sections 3318–20 of the Act eschews the possibility of such a rule.

The Louisiana cases that created and perfected the renotification rule dealt exclusively with leases of immovables. More significantly, almost every case that applied the renotification rule to such leases involved an attempt by the lessor to evict a tenant or occupant summarily after the lessor had accepted rental payment, in whole or in part, subsequent to the issuance of a notice of default.[10] We surmise, then, that the renotification rule was judicially created principally if not solely to counter the potentially harsh results that a tenant could face if a landlord should seek summary eviction after having accepted payment from a tenant previously lulled into thinking that the landlord had dropped the threatened action after such payment had been made.[11] Southeastern has advanced no compelling reason why the courts of Louisiana should afford such protection to a lessee of a movable. Neither can this court conceive of a reason that such protection is necessary. For the reasons discussed below, we are convinced that the Louisiana Supreme Court would recognize the distinction between leases of

**7.** See Galiendo v. Precision American Corp., 754 F.2d 1212, 1217 (5th Cir.1985) ("Where no state court has decided the issue, a federal court must make an educated guess as how that state's Supreme Court would rule.")

**8.** See Canal Realty & Improvement, Inc. v. Pailet, 217 La. 376, 46 So.2d 303 (1950).

**9.** La.Rev.Stat.Ann. 9:3301 et seq. (West 1991).

**10.** See Arms v. Rodriguez, 232 La. 951, 95 So.2d 616, 618 (1957) (acceptance of partial rent constitutes waiver of prior notice and forgiveness as to any and all previously committed infractions); Thompson v. Avenue of Americas Corporation, 499 So.2d 1093 (La.App. 3d Cir.1986); Adam, Inc. v. Dividend, Inc., 447 So.2d 80 (La. App. 4th Cir.1984); Passalaqua v. Mendez, 388 So.2d 1172 (La.App. 4th Cir.1980); Murphy Oil Corp. v. Gonzales, 316 So.2d 175 (La.App. 4th Cir.1975).

**11.** See, e.g., Arms, 95 So.2d at 617.

movables and leases of immovables in the context of notice and summary eviction, and would not extend the renotification rule to leases of movables.

## D. *Civilian Analysis.*

■ Under Louisiana's system of Civil Law, the primacy of jurisprudence and the binding nature of stare decisis that are the bedrock of the common law are inapposite. Although the courts of Louisiana rely on jurisprudence for instruction, and may virtually be bound by jurisprudence when the number and force of the cases are sufficient to constitute *jurisprudence constant,* the primary sources of private civil law in Louisiana are the state's Constitution and the codes and statutes enacted by the legislature. When this court's jurisdiction is based on diversity and the applicable substantive law is that of Louisiana, we are bound to dispatch our duty of legal interpretation as would a court of Louisiana, relying primarily on Louisiana's Revised Civil Code of 1870 (the Code) and other statutory law, including the rules of interpretation contained therein.

## THE CODE

■ We begin with the realization that the Code has from its inception recognized the nominate contract of lease and that, under the scheme of the Code, the object of a lease can be personal (movable) property, real (immovable) property, or services. Unlike the common law, however, Louisiana treats all leases as personal contracts. Louisiana does not make a taxonomical distinction between leases of movables and leases of immovables, as does the common law, under which a lease of real property creates an estate in land while a lease of personalty creates only a personal right.

In the Code, rules applicable to all Louisiana leases are found primarily in Book III, Title IX—Of Lease, beginning with article 2668. Chapter 2 of Title IX of the Code deals with leases of things, specifying in article 2678 that "[a]ll corporeal things are susceptible of being let out, movable as well as immovable...." Although some articles of the Code expressly or implicitly apply only to movables or only to immovables, the Code contains no chapters or sections specifically applicable only to leases of movables or only to leases of immovables.

Chapter 2 of Title IX contains several articles concerning notice. For example, in Section 1—General Provisions, following several articles on reconduction of the lease—including the suppletive provision in article 2686 for notice of termination when the agreement is silent as to duration (term)—article 2691 specifies that "[w]hen notice has been given, the tenant although he may have continued in possession, cannot pretend that there has been a tacit renewal of the lease." In Section 3 of Chapter 2, covering obligations and rights of the lessee, articles on *eviction* are clearly applicable only to leases of immovables. They include article 2713 which sets forth the role of notice in the context of eviction. Section 4, the final section of Chapter 2, covers dissolution of leases. In that section, only article 2739 addresses notice. It admonishes that the purchaser of leased property "who wishes to use the right reserved by the leases [per article 2733], for the purchaser of the thing leased to 'turn out the tenant before his lease has expired' is moreover bound to give previous notice to the tenant according to article 2686."

The point we make is that Title IX, Of Lease, does not contain a comprehensive and cohesive set of rules governing the furnishing, timing and content of notices to be furnished between lessor and lessee. Neither does Title IX contain specific rules about a formal putting in default, much less rules for the method of doing so. Therefore, in keeping with civilian methodology, we look for more generalized notice provisions applicable to all conventional obligations (contracts).

■ Our starting point in Book III of the Code is Title IV, Chapter 8, "Effects of Conventional Obligations." Section 1 of that chapter, General Effects of Contracts, begins with article 1983 which, while not addressing notice, is germane to the framework of this and all Louisiana contract cases. Article 1983 is the Code provision

that stands for the venerable Louisiana maxim that *the contract is the law between the parties.* As amended in 1984, article 1983 reads: "Contracts have the effect of law for the parties and may be dissolved only through consent of the parties or on grounds provided by law. Contracts must be performed in good faith." Implicit in that article is the rule of interpretation that, except for immutable matters of public policy, law rules of the Code are suppletive, not mandatory. Suppletive provisions only "clutch in" if the contract fails adequately to cover a given issue. For the instant analysis, then, we must keep in mind that express lease provisions concerning notice and default are the "law between the parties" irrespective of contrary notice and default provisions of the Code and other statutes—unless we should discover some public policy embodied in particular Code articles or statutes.

■ When the obligations provisions of the Code were revised extensively in 1984 under the aegis of the Louisiana State Law Institute, the importance of putting an obligor in default was greatly reduced, almost to the point of elimination. Although an obligee seeking damages resulting from *delay* in the performance of an obligation may only recover such damages from the time the obligor is put in default, other damages are owed from the time the obligor *fails* to perform—a putting in default is not required. *See* article 1989. In fact, when the term for performance is fixed by the contract or clearly determinable by the circumstances, the expiration of such term puts the obligor in default as a matter of law. Only when the term of performance is not clear from the contract must the obligor be put in default at or after the time his performance becomes due. *See* article 1990. Instructive to our consideration of the instant case is article 1991—clearly suppletive in its use of the permissive "may" rather than the mandatory

"shall"—which provides four alternative methods of putting an obligor in default when a default is required: "An obligee may put the obligor in default by a written request of performance, or by an oral request for performance made before two witnesses, or by filing suit for performance, or by specific provision of the contract." The final method, by specific provision of the contract, comports with article 1983 and adds support to applicability here of the Louisiana rule that the contract is the law between the parties.

In addition to revising the specific articles of the Code, the 1984 revision of the law of obligations included official Revision Comments, providing interpretive assistance. The Revision Comments under article 1989 state, inter alia, that the revised article "changes the law in part, by requiring an obligee to put his obligor in default *only when the obligee seeks damages for delay, or moratory damages."* (emphasis added). "Moratory damages presuppose a performance actually rendered, although delayed. In such a case, the object of the *obligee's recovery is compensation for the* injury his interest has sustained because of the obligor's untimeliness in performing. Compensatory damages presuppose, instead, total or partial non-performance, or defective performance, by the obligor." [12] "Recovery of damages for delay does not include recovery for other damages such as damages for defective performance. For the latter, *a putting of the obligor in default is not necessary."* [13] "Putting the obligor in default is not a prerequisite to filing suit .... for compensatory damages, as the judicial demand, in such a case, implies a demand for dissolution. Putting in default is not even a prerequisite to filing a suit for delay damages. An obligee who has not put his obligor in default before filing suit is deemed to do so at the moment of filing." [14] In addressing the elimination of the distinction between active and passive default, the Revision Com-

**12.** Section (b), Revision Comments to article 1989.

**13.** Section (c), Revision Comments to article 1989 (emphasis added).

**14.** Section (d), Revision Comments to article 1989.

ments to article 1989 state "[t]here is no need for that distinction in this revision, where the usefulness of putting in default is confined to marking a starting for delay damages." [15]

The greatly diminished significance of notice of default following the 1984 revision is also reflected in article 1990: "When a term for the performance of an obligation is either fixed, or is clearly determinable by the circumstances, the obligor is put in default by the mere arrival of that term." According to the Revision Comments under article 1990, "an obligee need not put the obligor in default when the contract stipulates a term for performance." [16]

Section (c) of the Revision Comments under article 1991 recognizes that "[p]utting in default is no longer necessary for the recovery of either compensatory or moratory damages when there is a term for performance." In the instant case, the Lease clearly specified the term for its performance.

Like the Code's provisions on lease in Title IX of Book III, its provisions on conventional obligations or contracts in Title IV of Book III are devoid of mandatory rules making a formal putting in default a prerequisite to a suit to cancel a lease of movables or to recover rent or other monies thereon, save only damages for delay in performance—not an issue in the instant case. Clearly, the *suppletive* provisions of the Code and the 1984 Revision Comments dictate that, absent an express requirement of notice of default in the agreement under consideration, none is required. Moreover, were such notices required, the filing of a

lawsuit would satisfy that requirement in the absence of some other contractually specified method.

Therefore, in our effort to make an informed prediction of how the Supreme Court of Louisiana would decide the renotification issue presented in the instant case, our view of the Code's provisions concerning conventional obligations in general and lease contracts in particular reveals no requirement, particularly no immutable, public policy requirement, that a lessor of movables furnish written notice of default to a lessee who is delinquent. Two conclusions that we can draw from our review of the Code are (1) the role of the formal "putting in default" is only a prerequisite to recovering damages resulting from *delay* in performance, and (2) the place we are instructed to look for guidance is the contract of lease itself. This is true not only because article 1983 tells us that contracts have the effect of law between the parties, but also because article 1991 expressly recognizes that the lease itself is one of the four nominate sources of provisions affecting notice of default, implying the obvious conclusion that the parties by their agreement may, but are not required to, impose a prerequisite of notice as well as an agreed method of furnishing it even though the Code does not.

### THE REVISED STATUTES

■ So much for our examination of the Code. Before adverting to the Lease itself, however, we are required by Civilian methodology to examine other primary [17] sources of Louisiana law. Louisiana's Constitution is devoid of provisions applicable to this subject, but the State's Revised Statutes are not. Title 9 of the Louisiana Revised Statutes of 1950 contains the so-

---

15. Section (f), Revision Comments to article 1989.

16. Section (b), Revision Comments to article 1990, citing *Kinsell & Locke, Inc. v. Kohlman,* 12 La.App. 575, 126 So. 257 (1930).

17. Historically, Louisiana defined law as the solemn [formal] expression of the legislative will. Since 1988, however, article 1 of the Code has defined *law* as "legislation and custom," and

article 2 has defined *legislation* as "a solemn expression of legislative will." Included among such enactments are the various codes and the revised statutes. Unlike the common law, civil law has no strict jurisprudential stare decisis system; court decisions are categorized as secondary sources of law. Custom is not at issue here. *See Green v. Walker,* 910 F.2d 291, 294 (5th Cir.1990).

called Civil Code Ancillaries, particular statutes that supplement the Code. The Act is found in Title 9 and is pertinent to our consideration here. By its own terms the Act is applicable to all leases of movable property located in Louisiana, whether the movable property in question was initially subjected to the contract of lease in Louisiana or subsequently moved into that state. As the Lease does not meet the Act's definition of a "consumer lease," the provisions of the Act are, like the provisions of the Code, *suppletive* for purposes of our consideration.[18] We note in passing that Part III of the Act, covering permissible charges, authorizes, inter alia, capitalization of interest charges,[19] as well as such additional lease-related charges as taxes, excess mileage or use charges, license, title and registration fees, repair, maintenance and other fees incident to the use of leased equipment, property insurance, early termination charges, reasonable excess wear and tear charges, reasonable attorneys' fees not to exceed 25% of the total amount payable under the lease, late charges, and "such additional related charges as may be contractually agreed to by the lessee."[20] The Act also permits recovery of "such liquidated damages as may be provided under the lease agreement.... if [the court] finds the amount thereof to be reasonable."[21]

■ Part IV of the Act covers remedies following the lessee's default, beginning in Section 3318 with the remedial options of the lessor. After setting forth the only two options available—(1) a collection suit to recover accelerated rental payments and additional amounts that are then due or that will become due in the future, and (2) lease cancellation, with recovery of possession of the lease property and such addi-

tional amounts and liquidated damages as may be contractually provided for under the lease agreement—Section 3318 declares the optional remedies to be non-cumulative or disjunctive. Thus, the lessor must elect either to sue for collection of past due rent and accelerated future rental payments under the lease, or to cancel the lease, recover possession of the leased property, and collect past due rent and charges. He cannot do both. That prohibition is clearly mandatory, not suppletive. Any provision of a lease agreement to the contrary notwithstanding, the lessor is allowed to select one remedy or the other, but he is not allowed to cumulate both.

More precisely to the point are the two sections to the Act immediately following Section 3318. Section 3319 specifies that if the lessor elects the first option—recovery of accelerated "future" rental payments as well as additional authorized amounts—he need only file an ordinary collection suit against the lessee pursuant to the Louisiana Code of Civil Procedure. Notably, Section 3319 is consistent with the current conventional obligations provision of the Code in not requiring a formal putting in default as a prerequisite to a suit to recover accelerated rental payments.

■ Complementing Section 3319 is Section 3320, which specifies the procedures to be followed by the lessor of movables who elects the second alternative remedy, lease cancellation. Even though a basic tenet of Louisiana contract law is and always has been that a party cannot employ "self help" to terminate a contract extra-judicially but instead must obtain a judgment of termination, Section 3320 embodies an express exception to that rule. Under Section 3320, the lessor of a movable who elects the remedy of lease termination

**18.** Section 3306(8) defines "consumer" as a natural person entering into a lease primarily for a personal, family or household purpose; and Section 3306(9) defines a "consumer lease" as a lease to a consumer in which total compensation over the base lease term does not exceed $25,000.00. Section 3305 specifies that "[a] consumer lessee may not waive or agree to forego any rights or benefits" of the lessee under the Act. By clear implication the provisions of the

Act are waivable and therefore suppletive as to all leases of movables other than consumer leases.

**19.** *See* Section 3311.

**20.** *See* Section 3313.

**21.** *See* Section 3325.

is empowered to do so extra-judicially, simply by delivering written notice "to that effect" to the lessee, either personally or by registered or certified mail. Therefore, unless a particular lease agreement expressly requires the lessor to furnish a pre-termination notice of default, the lessor of a movable is empowered by the Act to cancel the lease of a movable unilaterally by executing and delivering to his lessee a declaration that the lease is terminated. Significant to our analysis, the lessor is not required even to file a lawsuit seeking a judgment of lease termination and collection of past rental and other charges due, much less furnish a prior demand to the lessee to make the rent current. As a result of such extra-judicial lease termination, the lessor is entitled, by the provisions of Section 3321 of the Act, to recover possession of the leased property within five days following notice of termination. Pursuant to Section 3322, the lessor may institute summary proceedings by rule to show cause why the leased property should not be ordered surrendered if the lessee does not deliver the property within that five-day period. Significantly, nothing in Sections 3318–22 states or even implies that a lessor of movables who elects to terminate the lease by notice to the delinquent lessee is subject to having such lease termination and the benefits flowing to the lessor negated by the lessee's tender or the lessor's acceptance of any or even all of the sums due under the lease.

Just as the 1984 revisions of the conventional obligations provisions of the Code eliminated the historical role of a formal putting of the obligor in default, the Act has done the same for leases of movables. In its silence, the Act has gone even further; it is devoid of provisions that would otherwise make formal notice or putting in default a prerequisite to the lessor's exercise of his remedies following a breach of the lease by the lessee.

 In summary, we find no primary source of current Louisiana law that would support a prediction that the State's highest court would require a lessor of movables to renotify his lessee if, after an initial notice of default—assuming one is required under the lease—the lessee should partially comply by curing some of the delinquencies cited in the notice of default. And, lest Southeastern be tempted to re-urge that it complied fully with GECC's original demand as set forth in the Notice, we add that we find no primary source of current Louisiana law that would support a prediction that the highest court of the state would require renotification even if Southeastern had cured all delinquencies set forth in the Notice.

## THE LEASE

 Having examined ad nauseam the portions of the Code and the Revised Statutes that bear on the issue of "renotification," we turn next to applicable provisions of the Lease. In that endeavor we examine the "Remedies" portion of the Lease, as set forth in SECTION 19 (reproduced in full as Appendix II of this opinion). In close parallel to the suppletive provisions of Sections 3318–20 of the Act, SECTION 19 of the Lease gives GECC, as lessor, the option of "one or more" of two remedies.[22]

The optional remedies open to GECC under SECTION 19 are essentially the same as those that Section 3318 of the Act would supply in the absence of such a contractual provision. Subsection (i) of SECTION 19 spells out GECC's first alternative: to en-

---

**22.** As noted above, Section 3318(A)(2) of the Act, prohibiting the lessor from both collecting all future rental *and* terminating the lease and re-possessing the lease property, reflects Louisiana public policy and thus cannot be varied by the contract. It follows that the portion of SECTION 19 that purports to allow GECC to exercise *both* of the remedies rather than only one or the other is unenforceable; GECC is limited to a choice of one or the other but cannot seek both remedies. Although that issue is not before us, we do not find that GECC attempted to exercise both remedies in violation of the Act's public policy prohibition.

force performance of the obligations of the lessee under the Lease or to recover damages for the breach of such obligations. That remedy under the Lease closely parallels the substance of the first optional remedy under the Act as set forth in Section 3318(A)(1)(a). Although the Act speaks only of a suit to recover amounts due and to become due in the future over the full base term of the lease, there can be no doubt but that implicit in that remedy is the lessor's right to sue for specific performance of the lessee's obligations under the lease. It is equally clear under the Act that, if there are lessee obligations to *do* as well as to *pay*, the lessor may seek monetary damages and specific performance.

Likewise, GECC's second alternative remedy under the Lease, as spelled out in Subsection (ii) of SECTION 19, is the substantive equivalent of the lessor's second optional remedy under the Act as set forth in Section 3318(A)(1)(b)—to cancel the Lease extra-judicially by furnishing notice, and to recover possession of the aircraft as well as additional amounts provided for in the Lease, including liquidated damages—but clearly *not* future, unearned rental payments. Subsection (ii) allows GECC to terminate the Lease merely by informing Southeastern in writing, and immediately thereafter to regain possession of the aircraft, and recover an amount equal to any earned but unpaid rent for periods up to and including the date upon which GECC declares the Lease to be default. Subsection (ii) expressly authorizes GECC to recover liquidated damages and other specified sums.

Thus we see that SECTION 19 of the Lease not only parallels Section 3318 of the Act in general, but Subsections (i) and (ii) of SECTION 19 essentially replicate Sections 3319 and 3320 of the Act. The first optional remedy under the Lease and the first optional remedy under the Act both contemplate a collection suit against the lessee without termination of the Lease.

Neither the second optional remedy under the Lease nor the second optional remedy under the Act contemplates a suit against the lessee but both contemplate written notice of termination from the lessor to the lessee, cancelling the lease, regaining possession of the leased property, and recovering money only for earned but unpaid amounts and for the cost of having delinquent obligations of the lessee performed—but not for "accelerated," as yet unearned rent for the future periods of the lease term.

As is the case under the Act, there is nothing expressed or implied in the remedial provisions of SECTION 19 of the Lease that can be construed to require that GECC formally put Southeastern in default—and give Southeastern an opportunity to cure the noticed delinquencies and thereby maintain the existence of the Lease—as a suspensive condition to GECC's exercise and enforcement of its remedial rights, by litigation if need be. Absent such a prerequisite, we find no basis for treating written notice under SECTION 19 as though it were subject to Louisiana's renotification rule. It follows that once all past due and current obligations under the Lease have been accelerated, and the Lease has been cancelled or terminated by notice, no amount of performance by Southeastern, and no amount of acceptance by GECC of Southeastern's performance (payment), can breathe life back into the dead Lease. Consequently, there is no basis in law or in SECTION 19 for applying the "renotification" rule when, following receipt of the Notice, Southeastern remitted the two delinquent monthly payments owed to GECC under the Lease. Simply stated, nothing in SECTION 19 or in the law of Louisiana can be construed to vitiate notice furnished thereunder and thereby reinstate the Lease to a fully current status even if the lessee were to remit all funds due and owing and the lessor were to accept them. GECC's lawsuit was not filed to cancel the Lease.

That had already been done by delivery of the Notice to Southeastern. Neither was the suit filed to recover possession of the aircraft; that had already been done by amicable demand after the May 1987 renegotiation session. The suit was filed for the sole purpose of collecting earned but unpaid rent and all other monies due under the Lease, up to the date of cancellation.

## THE JURISPRUDENCE

To this point we have found no basis in the Code, the applicable Revised Statutes, or the relevant provisions of the Lease to support a prediction that the highest court of Louisiana would require GECC to furnish a new, second demand before filing the suit in district court. Consequently, we need only satisfy ourselves that nothing in the secondary law sources of Louisiana—its jurisprudence—would affect the prediction we are required to make.

 Unlike a lease of movables, a Louisiana lease of immovables cannot be cancelled extra-judicially by the lessor's simply furnishing notice of termination to the lessee. A lease of immovables can only be cancelled by a judgment or by mutual consent of the parties. It follows then, that *if* the lessor of Louisiana immovable property furnishes notice placing the lessee in default under the Lease, and *if* the lessor thereafter accepts payment of all or even a portion of the amounts that were delinquent, the default is cured and the previous notice of default is vitiated. Under a lease of immovable property, partial continuation of the delinquency or default does *not* sustain viability of the notice.[23]

In the instant case the district court relied on the "renotification" rule as developed in the jurisprudence relative to leases

of immovables. The court found that even though the cited cases dealt with leases of immovable property, there is no indication in Louisiana's jurisprudence that this general principle should not be applied to leases of movables as well. We must disagree with that reasoning, as well as that result, reaching precisely the opposite conclusion: we perceive no indication in the case law of Louisiana that the "renotification" principle should be applied to leases of movables. To the contrary, we find strong indications from our reading of the Act and of the recently revised Conventional Obligations section of the Code that the Supreme Court of Louisiana would be more likely than not to refrain from extending the "renotification" rule to leases of movables, and would be more likely than not to limit the application of that rule to leases of immovables at most.

## THE NOTICE

 We find that when GECC furnished the Notice it complied substantially, if somewhat inartfully, with the provisions of SECTION 19(ii) of the Lease. Given the euphemistic terminology of the Lease, the drafters of the Notice did well enough to accomplish the purpose of terminating the Lease. When the Notice "recalled the note" it was, in effect, cancelling the Lease. When GECC declared that it would make efforts "to recover the demanded payment [the "account balance"] and/or the recovery of the collateral [the aircraft] and any deficiency balance as a result of the legal disposition of the collateral," GECC was properly addressing the provisions of the lease that allow the lessor to regain possession of the plane, sell it on the open market, and then seek from the lessee any remaining sums not covered by the

---

**23.** *See Thompson,* 499 So.2d at 1095; *Adam, Inc.,* 447 So.2d at 82. Regardless of whether the delinquencies specified in the initial notice are met with a total or only a partial cure by the lessee of immovables, that notice is invalidated for all purposes, requiring the lessor to initiate an entirely new notice procedure before filing a lawsuit to have the lease judicially cancelled and to collect rental and other sums due through the effective date of judicial termination. This is the "renotification" rule. Whether courts of Louisiana continue to enforce that jurisprudential rule in cases involving leases of immovables in light of the 1984 amendments to the conventional obligation provisions of the Code remains to be seen.

sales proceeds. When the Notice spoke of Southeastern's being "assessed for all costs of collection, litigation and foreclosure of the collateral," it was again properly addressing GECC's rights under the Lease to charge Southeastern for such costs as those incurred by GECC in (1) repossessing the plane, bringing it up to legal fitness per the FAA and terms of the Lease to make a foreclosure sale legally and financially feasible, (2) legal fees, (3) court costs, (4) inspection charges, and the like. Consequently, the subsequent negotiations between the parties, GECC's deposit of the checks for the February and March installments, and Southeastern's return of the aircraft to GECC, did not have the effect of vitiating the Notice, of negating GECC's exercise of the remedies by its compliance with SECTION 19(ii), or of reviving and revitalizing the Lease.

■ Even if we were to assume, arguendo, that the renotification rule were applicable to leases of movables generally, we could not find that rule applicable in the instant case. In his April 23rd reply to GECC, Dr. Smith expressly acknowledged the April 7th default and likewise acknowledged that Southeastern's default was continuing. In his pretrial stipulations filed in the district court on November 6, 1989, Dr. Smith agreed that the Notice "accelerated" the "account balance" under the Lease. As both sides stipulated, the purpose of the May 17th meeting was to explore renegotiation of the terms and conditions of the Lease or to settle the dispute; but that meeting was unsuccessful. GECC's continuing determination to recover all delinquencies was evidenced by its retention of the checks for the February and March installments until after the May 17th meeting proved that efforts to achieve a workout with Dr. Smith and Southeastern were fruitless. Furthermore, shortly after that meeting, GECC amicably requested return of the aircraft, confirming yet again its termination of the Lease; and Southeast-

ern voluntarily returned the plane. After all, by the provisions of SECTION 19 of the Lease, Southeastern was expressly required to do just that. Any attempt by Southeastern to retain possession of the aircraft at that point would merely have added to its legal costs by forcing GECC to institute litigation to regain possession of its property.

Under all these circumstances no reasonable lessee could have believed that GECC's deposit of the February and March checks late in May, after workout negotiations broke down, somehow signaled a waiver or forgiveness of Southeastern's delinquencies or its default under the Lease. Any subsequent notice of default that GECC may have furnished would clearly have been unnecessary and futile—a classic "hollow act." From the course of conduct between GECC and Southeastern, as well as from Smith's own written statement, Southeastern's indebtedness to GECC was certain to remain unpaid for the foreseeable future. GECC's demand for return of the aircraft was sufficient to erase any possible doubt on the part of Southeastern that GECC was anything other than irrevocably committed to cancellation of the Lease, and to recovery of its property and all amounts earned but unpaid under the Lease. As recovery of the aircraft occurred after the rent checks were deposited, Southeastern could not have reasonably believed that GECC considered Southeastern's default to have been cured. More importantly, Southeastern neither changed its position nor relied detrimentally on any such misconception.

### III.

### CONCLUSION

We find that GECC's formal default notice of April 7, 1987, complied with Subsec-

tion (ii) of SECTION 19 of the Lease, and was unaffected by GECC's receipt of partial payment of Southeastern's delinquencies or by the voluntary return of the aircraft. As such, GECC's notice of April 7, 1987, effectively terminated the Lease. The district court thus erred in dismissing GECC's suit to recover the balance of money due under the Lease. As both parties moved for summary judgment, thereby pretermitting the existence of a genuine issue of material fact, GECC is entitled to a summary judgment against Southeastern and Dr. Smith *in solido*. Therefore, it remains only for the district court to determine the net amount due to GECC from Southeastern and Dr. Smith.

For the foregoing reasons, the summary judgment granted by the district court in favor of Southeastern and Dr. Smith, dismissing GECC's suit, is REVERSED; summary judgment is RENDERED in favor of GECC and against Dr. Smith and Southeastern *in solido;* and this case is REMANDED to the district court for the limited purpose of determining the net amount of the judgment and for entry of the judgment in such amount, consistent with this opinion and the provisions of the Lease.

## APPENDIX I

SOUTH TERRITORY
PORTFOLIO CONTROL CENTER
COMMERCIAL EQUIPMENT FINANCING

4077 WOODCOCK DRIVE
SUITE 200
JACKSONVILLE, FL 32207
TELEPHONE: (904) 290–5500

CERTIFIED MAIL NUMBER P–426–650–074

April 7, 1987

Southeastern Healthcare, Inc.
8108 Picardy
Baton Rouge, LA 70809

RE: General Electric Credit Corporation
 Account Number 140128
 Collateral: One (1) Beechcraft Super King Air B200, N# 18262, S# BB927
 Two (2) Pratt Whitney engines, 2 Hartzell Propellers

Dear Sir,

General Electric Credit Corporation hereby notifies you that it has elected to institute the provisions of default under the Aircraft Lease by and between Southeastern Healthcare, Inc. and General Electric Credit Corporation executed November 5, 1981.

General Electric Credit Corporation has attempted to reconcile the delinquent status of this account without success which has left no alternative but to accelerate the account balance in accordance with the terms of the Lease.

Therefore, General Electric Credit Corporation has indeed recalled the note in the amount of $1,448,196.69 as follows:

| | |
|---|---|
| Casualty Value @ 72.05%: | $1,296,900.00 |
| Sales Tax on Casualty Value: | 51,876.00 |
| February 6, 1987 rental: | 19,500.00 |
| Sales Tax on rental: | 780.00 |
| March 6, 1987 rental: | 19,500.00 |
| Sales Tax on rental: | 780.00 |
| April 6, 1987 rental: | 19,500.00 |
| Sales Tax on rental: | 780.00 |
| Property Tax for 1986: | 13,403.55 |
| Sales Tax on Property Tax: | 536.14 |
| Estimated 1987 Property Tax: | 13,000.00 |
| Sales Tax on Estimated Property Tax: | 520.00 |
| Late charges due: | 11,121.00 |

Page two (2)

General Electric Credit Corporation hereby makes formal demand that funds be received in our Jacksonville offices within ten (20) days. It should be clearly understood that General Electric Credit Corporation will seek every possible remedy under the law to recover the demanded payment and/or the recovery of the collateral and any resulting deficiency balance as a result of the legal disposition of the collateral. Further, as provided in the Lease, this account will begin accruing interest from April 27, 1987 at the highest rate allowed by law. You will also be assessed for all costs of collection, litigation and foreclosure of the collateral.

Should you have any questions, please do not hesitate to contact our office immediately at the above address or phone number. Otherwise, you are hereby notified of General Electric Credit Corporation's demand and intent. This letter is also being sent to you by regular mail to insure it's delivery.

Regards,

GENERAL ELECTRIC CREDIT CORPORATION

(s) James E. Powell
James E. Powell
Territory Accounts Manager

0992F

APPENDIX II

SECTION 19. Remedies. (a) Upon the occurrence of any Event of Default and so long as the same shall be continuing, the Lessor may, at its option, declare this Lease to be in default by written notice to such effect given to the Lessee, and at any time thereafter, the Lessor may exercise one or more of the following remedies, as the Lessor in its sole discretion shall lawfully elect:

 (i) Proceed by appropriate court action, either at law or in equity, to enforce performance by the Lessee of the applicable covenants of this Lease or to recover damages for the breach thereof;

(ii) By notice in writing terminate this Lease, whereupon all rights of the Lessee to the use of the Aircraft or any part thereof shall absolutely cease and terminate but the Lessee shall remain liable as hereinafter provided; and thereupon the Lessee, if so requested by the Lessor, shall at its expense promptly return the Aircraft to the possession of the Lessor at such place as the Lessor shall designate and in the condition required upon the return thereof pursuant to and in accordance with the terms hereof, or the Lessor, at its option, may enter upon the premises where the Aircraft is located and take immediate possession of and remove the same together with any Engines and Parts by summary proceedings or otherwise. In addition, upon the written request of the Lessor, the Lessee, at its expense, will replace any engine installed on the Airframe with an Engine. The Lessee shall, without further demand, forthwith pay to the Lessor an amount equal to any unpaid Rent due and payable for all periods up to and including the Basic Rent Date following the date on which the Lessor has declared this Lease to be in default, plus, as liquidated damages for loss of a bargain and not as a penalty, an amount equal to the Casualty Value of the Aircraft, computed as of the Basic Rent Date preceding the date on which the Lessor has declared this Lease to be in default. Following the return of the Aircraft to the Lessor pursuant to this sub-paragraph (ii) the Lessor shall proceed to sell the Aircraft by public or private sale in such manner as it shall deem appropriate provided that the Lessor, if it so elects, may purchase the Aircraft at such sale for a price not less than the highest bona fide bid given by a person unrelated to the Lessee or the Lessor. The proceeds of such sale shall be applied by the Lessor (x) first, to pay all costs, charges and expenses, including Liens, governmental fines and assessments prior in right to that of Lessor in the Aircraft and all reasonable legal fees and disbursements incurred by the Lessor as a result of the default and the exercise of its remedies with respect thereto, (y) second, to pay to the Lessor an amount equal to any unpaid Rent due and payable and the Casualty Value, to the extent not previously paid, and (z) third, to reimburse the Lessee for the Casualty Value to the extent previously paid by the Lessee as liquidated damages. Any surplus remaining thereafter shall be retained by the Lessor. To the extent that all Basic Rent then due and payable with respect to the Aircraft and the Casualty Value in respect of the Aircraft have not been previously paid, the Lessee shall forthwith pay to the Lessor the sum of (A) the amount by which (1) the sum of (aa) all Basic Rent then due and payable with respect to the Aircraft, (bb) the Casualty Value or portion thereof not theretofore paid, and (cc) the amount payable under clause (x) of the preceding sentence, exceeds (2) the sale price of the Aircraft, and (B) interest at the Late Payment Rate on the full amount of said Casualty Value and unpaid Basic Rent then due, computed from the date such sums are due until the same are paid by the Lessee.

(b) The Lessee shall be liable for all costs, charges and expenses, including reasonable legal fees and disbursements, incurred by the Lessor by reason of the occurrence of any Event of Default or the exercise of the Lessor's remedies with respect thereto.

(c) The Lessee hereby waives, to the extent now or hereafter permitted by applicable law, for itself and for its successors and assigns, any and all rights the Lessee or the Lessee's successors or assigns may have under any bankruptcy, insolvency or similar laws, rules or regulations with respect to the continued possession or use of the Aircraft, or payment of Rent therefor, or with respect to this Lease.

(d) No remedy referred to herein is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to the Lessor at law or in equity. No express or implied waiver by the Lessor of any Default or Event of Default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent Default or Event of Default. The failure or delay of the Lessor in exercising any rights granted it hereunder upon any occurrence of any of the contingencies set forth herein shall not constitute a waiver of any such right upon the continuation or recurrence of any such contingencies or similar contingencies and any single or partial exercise of any particular right by the Lessor shall not exhaust the same or constitute a waiver of any other right provided herein.