Revised August 29, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-30964
_____

CITY OF SHREVEPORT

      Plaintiff-Appellee

-vs-

SHREVEPORT CANADIAN FOOTBALL, INC., et al.

      Defendants-Appellants

_____

Appeal from the United States District Court
for the Western District of Louisiana
_____

August 8, 2001

Before HIGGINBOTHAM and BENAVIDES, Circuit Judges, and LITTLE, District Judge.[*]

LITTLE, District Judge:

      For the reasons that follow, we remand for the district court's further consideration

of this contract dispute.

---

[*] Chief Judge F.A. Little, Jr. of the Western District of Louisiana, sitting by designation.

BACKGROUND

Professional football is indeed a sport well accepted by its American audience. In the year 2000, attendance at National Football League games set an attendance record for the third consecutive year. Total regular-season ticket sales were 16,387,289, an average of 66,078 per game. The league played to ninety percent of its overall stadium capacity, even though average ticket prices rose to nearly $50, up from $45 in 1999.[1]

North of our borders, the Canadian Football League pits its own teams in combat, all to the seeming satisfaction of its many supporters. With an eye toward capturing some of the paying enthusiasm of United States fans for football, our Canadian neighbors invaded Louisiana when they licensed a Canadian Football League ("CFL") franchise in Shreveport in 1994. For reasons not readily apparent from the record, the 1994 season was not a financial bonanza. Not to be deterred, management, led by franchise owner Bernard Glieberman, approached the City of Shreveport seeking the City's financial involvement in retaining the team in Shreveport for the 1995 season.

Municipal entanglement as an equity owner or as a creditor are proscribed participations. The City could, however, promote the franchise, from which the city would benefit, by being a franchise sponsor. With that altruistic goal in mind, the City and the management of the CFL Shreveport franchise entered into a contract, which they labeled a Cooperative Endeavor Agreement ("CEA"). The principal obligation of the City, an obligation all agree was fulfilled, was to contribute $1,000,000 to Shreveport Canadian

[1] See Richard Alm, Sports Business Briefs, Dallas Morning News, Jan. 6, 2001, at 2F.

2

Football, Inc. ("Football"). The franchisee for the lackluster 1994 season was Shreveport Pirates, Inc. ("SPI"). The City was reticent to supply its sponsor dollars directly to SPI, believing that SPI creditors for past due obligations might be paid in preference to the money demands for the 1995 season. Football, a Michigan corporation, was formed with the intention of being the operating corporation, a fresh start entity. Payments to Football therefore would not be commingled with the property of SPI.[2]

The million dollar sponsorship was not without some condition and contingency.[3] Stripped to its barest essentials, the CEA provided that the City would contribute a sponsorship payment of $1,000,000 or 50% of Football losses, whichever was less. City made the equivalent of an advance payment on its sponsorship obligation by making a contribution, over a period of time, of $1,000,000. There would be a reimbursement to the City if Football's losses did not exceed $2,000,000. For example, if the team lost $750,000, City would be reimbursed $625,000. If the team lost $2,000,000 or more the City would not receive any reimbursement. Provision also was made for return of sponsorship contributions in the event the team turned a profit.

After the 1995 season ended, the City demanded return of the $1,000,000 sponsorship payment. The City asserted that Football had not sustained any loss and therefore, according to the CEA, the City was entitled to be reimbursed the entire $1,000,000 sponsorship

---

[2] Glieberman also personally guaranteed the obligations of Football.

[3] As further consideration for the sponsorship, Football agreed to give the City numerous advertising, promotion and public relations benefits. These benefits included a "stay-in-school" program to be implemented with the assistance of Pirates players. In addition, Football agreed to provide free season tickets to certain students and to provide development assistance for neighborhoods and businesses near Independence Stadium.

contribution. Football refused payment and defended its stance by positing that: (1) its agent, SPI, operated the team, (2) SPI received the City sponsorship payments from Football, (3) SPI operated at a loss, and (4) the loss was the loss of the principal, Football. The City sued in state court, Football removed to the Federal District Court for the Western District of Louisiana, Shreveport Division. After a three-day bench trial, the district judge held in favor of City and against Football and guarantor Glieberman.

## ANALYSIS

The district court did not rule, as a matter of law, that SPI was not the agent of Football. The district court decided the case by first "[a]ssuming defendants' argument that Football was the principal." The court then reasoned, applying Louisiana law, that because there had not been a demand from SPI to Football for repayment of the losses SPI sustained, Football had not suffered any loss. Without evidence of any loss, Football, under the plain language of the contract, owed the City $1,000,000. We review the decision of the district court de novo.

The Erie doctrine requires that we apply Louisiana law to the issue of the necessity of demand as a predicate for recovery by an agent from its principal for reimbursement of expenses incurred by the former on behalf of the latter. See Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817 (1938); Salve Regina College v. Russell, 499 U.S. 225, 239-40,111 S. Ct. 1217, 1225 (1991) (holding that federal courts of appeal should conduct de novo review of a district court's determination of state law). The theory or concept of mandate,

4

as agency is nominated in the civil law, is found in Book III, Chapter 2, of the Louisiana Civil Code. The definitional article provides that "[a] mandate is a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal." La. Civ. Code art. 2989. As to loss, the Civil Code provides that "[t]he principal is bound to compensate the mandatary for loss the mandatary sustains as a result of the mandate, but not for loss caused by the fault of the mandatary." La. Civ. Code art. 3013.

When asked if a putting in default, or demand, must precede establishment of responsibility by the principal to the mandatary, the Louisiana Civil Code is the oracle. The demand provision applicable to all conventional obligations or contracts provides that: "[d]amages for delay in the performance of an obligation are owed from the time the obligor is put in default. Other damages are owed from the time the obligor failed to perform." La. Civ. Code art. 1989. As the obligation of Football to indemnify SPI for its losses incurred in operating the Shreveport based team is not a claim for delay damages, it is abundantly clear from Article 1989 that no demand by Football was necessary to establish its obligation to repay SPI for the losses SPI incurred. Our opinion is buttressed if not ordained by the language of a prior panel of this court in General Electric Capital Corp. v. Southeastern Health Care, Inc.:

> When the obligations provisions of the Code were revised . . . the importance of putting an obligor in default was greatly reduced, almost to the point of elimination. Although an obligee seeking damages resulting from *delay* in the performance of an obligation may only recover such damages from the time the obligor is put in default, other damages are owed from the time the obligor *fails* to perform–a putting in default is not required.

5

950 F.2d 944, 951 (5th Cir. 1991).  The resulting rule can only be that a claim for damages

need not be preceded by a putting in default unless the damages are for delay in performance

by the obligor.


## CONCLUSION

The district court erred when it presumed, but did not find, the presence of mandate.

This case is remanded to the trial court for retrial on that key issue, and for further

proceedings consistent with this opinion.  If the court discerns the presence of mandate, then

it should proceed to determine the consequence of the damages incurred by the mandatary.