**George BARASICH, et al**

v.

**COLUMBIA GULF TRANSMISSION CO., et al.**

**Civil Action Nos. 05–4161, 05–4569.**

United States District Court, E.D. Louisiana.

Sept. 28, 2006.

Conrad S.P. Williams, III, Charles Clarence Bourque, Jr., Christopher John St. Martin, Joseph G. Jevic, III, Melanie G. Lagarde, Michael X. St. Martin, St. Martin & Williams, Houma, LA, Amy Collins Fontenot, Val Patrick Exnicios, Liska, Exnicios & Nungesser, Gregory Pius Dileo, Attorney at Law, New Orleans, LA, for

George Barasich, Courtney Foxworth, Darin Tircuit, Ralph H. Long, Jr. Individually and as Representatives of all those Similarly Situated.

Thomas R. Blum, Thomas John Fischer, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA, for Columbia Gulf Transmission Company.

Charles S. McCowan, Jr., Glenn Michael Farnet, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA for Koch Pipeline Company, L.P.

Robert John Young, III, Young, Richaud & Myers, LLC, Metairie, LA, for Gulf South Pipeline Company, LP.

Thomas M. McNamara, Johnson, Gray, McNamara, LLC, Lafayette, LA, Jill Thompson Losch, Johnson, Gray, McNamara, LLC, Covington, LA, Roy J. Rodney, Jr., Rodney & Etter, LLC, Lafayette, LA, for Shell Pipeline Company LP.

Joseph E. Leblanc, Jr., King, Leblanc & Bland, PLLC, Houston, TX, Elizabeth S. Wheeler, King, Leblanc & Bland, LLP, New Orleans, LA, for Tennessee Gas Pipeline Company.

Linda Sarradet Akchin, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, for Transcontinental Gas Pipeline Corporation.

## ORDER

VANCE, District Judge.

Before the Court is defendants' consolidated motion to dismiss the above captioned cases for nonjusticiability and for failure to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6). For the following reasons, the Court DENIES defendants' motion as to justiciability and GRANTS defendants' motion for failure to state a claim under Fed.R.Civ.P. 12(b)(6).

## I. BACKGROUND

In the fall of 2005, Hurricanes Katrina and Rita swept ashore in Louisiana, causing billions of dollars in economic losses, catastrophic destruction of property and substantial loss of life. This action seeks to hold oil and gas producing companies and/or oil and gas pipeline companies accountable for their activities that the plaintiffs allege contributed significantly to the storms' destructive impact in south Louisiana. The plaintiffs are nine residents of Jefferson, Orleans, and St. Bernard Parishes. They assert that defendants damaged the marshland that lies between Louisiana's habitable regions and the Gulf of Mexico, thereby weakening a protective barrier against hurricanes and exposing Louisianans to the prospect of greater harm from these storms. Plaintiffs seek to hold defendants liable for their activities in Louisiana's marshlands and recover for the damages these activities caused.

Initially, the plaintiffs filed two separate class actions, *Barasich, et al v. Columbia Gulf Transmission Co., et al*, No. 05–4161, and *Villa, et al v. Columbia Gulf Transmission Co., et al*, No. 05–4569, in this district. The Court consolidated these actions because they raise identical questions of law and fact. Plaintiffs have since filed a joint amended complaint proposing to proceed on behalf of the following class of individuals:

All persons and/or entities, who/which have sustained injuries, loss, and/or damages as a result of the enhanced impact of hurricane force winds and storm surges as a result of wetland loss attributable to oil and gas exploration and/or production activities and who/which were residents of, or owned properties and businesses in the following parishes west of the Louisiana/Mississippi state line: St. Bernard, Orleans, Plaquemines, Jefferson, St. Tammany,

Tangipahoa, Livingston, St. John the Baptist, St. Charles, Lafourche, Ascension, St. James, Assumption, Iberia, St. Martin, St. Mary and Terrebonne.

(R. Doc. 28). In both actions, plaintiffs named two substantially similar classes of defendants. The *Barasich* plaintiffs named a "Pipeline Class" and an "Exploration and Production Class," while the *Villa* plaintiffs named a "Pipeline Class" and an "Exploration Class." The Court, for the sake of convenience, will refer to these as the "pipeline class" and the "exploration class," respectively.[1]

In their complaint, plaintiffs allege the following facts, taken as true for the purpose of this motion. The marshlands of coastal Louisiana provide protection to the rest of the state from the winds and storm surge brought by hurricanes. Over the course of many decades, defendants in the pipeline class have dredged canals through these marshlands for the purpose of installing pipelines for the transportation of petroleum products, and defendants in the exploration class have dredged canals to access and locate drill sites within the same marshlands. The activities of the pipeline and exploration classes continue through today, with nearly 10,000 miles of oil and gas pipelines crisscrossing the south Louisiana marshlands. The plaintiffs allege that as a result of the defendants' operations in south Louisiana, over one million acres of marshland have already been destroyed, and millions more essentially decimated, depriving inland communities, such as the City of New Orleans and St. Bernard Parish, of their natural protection from hurricane winds and accompanying storm surge.

More specifically, the plaintiffs allege that the defendants' dredging of the canals through south Louisiana has harmfully altered the hydrology of the adjacent marshes by allowing salt water intrusion into the marshlands, and creating spoil banks that limit the tidal and fresh water flows essential for distributing mineral sediments, inorganic sediments, and organic matter to those areas. The effect of the increased exposure to salt water and reduced exposure to fresh water is destruction of indigenous plant life. The plaintiffs allege that it is this marsh vegetation that traps sediment, builds organic soils, and stabilizes the soil with a dense mat of live roots. Without the marsh vegetation, plaintiffs allege that the root mat disappears, resulting in erosion of the exposed soil and the eventual conversion of the marshlands to open water.

Additionally, the plaintiffs allege that the defendants, through their knowing failure to maintain their canals, have allowed numerous breaks or cuts to develop and enlarge in the spoil banks, which has resulted in further erosion and destruction of the marshlands. Plaintiffs allege that the water that flows through these canals and into the adjacent marshes has sufficient energy to erode or break up underlying sediment and organic material from beneath the root mat. According to the plaintiffs, the gradual destruction of the root mat leads to the death of indigenous plant life, which facilitates erosion and eventually conversion of the marshlands to open water.

In their Second Amended Complaint, filed jointly, the *Barasich* and *Villa* plaintiffs assert that as a direct result of defen-

---

1. The pipeline class includes: Columbia Gulf Transmission Co., Koch Pipeline Company, L.P., Gulf South Pipeline Company, LP, Shell *Pipeline Company LP, Tennessee Gas* Pipeline Co., and Transcontinental Gas Pipeline Corp.

The exploration class includes: Shell Oil Co., Exxon Mobil Corp., ExxonMobil Oil Corp., Chevron U.S.A. Inc., and BP Corporation NA, Inc.

dants' actions in the Louisiana marshland, class members suffered personal injury and/or death, property damage, and the loss of the wetlands' value as storm protection. They base their claims for recovery on Louisiana Civil Code articles 667, 2315, and 2317, and ask for "all damages reasonable in the premises, including restoration." Defendants jointly filed a motion to dismiss plaintiffs' claims. Defendants assert that dismissal is warranted on two grounds: 1) the subject matter of plaintiffs' action is nonjusticiable because it concerns a political question, and 2) plaintiffs do not state a claim upon which relief may be granted because they cannot prove the requisite elements for recovery as a matter of law under any available theory.

## II. LEGAL STANDARD

### A. Motion to Dismiss Under 12(b)(6)

In a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and view the facts in the light most favorable to the plaintiff. *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir.1996); *American Waste & Pollution Control Co. v. Browning–Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir.1991). The Court must resolve doubts as to the sufficiency of the claim in plaintiff's favor. *Vulcan Materials Company v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir.2001). Dismissal is warranted if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *Id.; Piotrowski v. City of Houston*, 51 F.3d 512, 514 (5th Cir.1995) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir.1994)).

## III. DISCUSSION

### A. Justiciability

Defendants assert that the Court should dismiss the matter because it presents a nonjusticiable political question. Certain general principles apply in political question cases. Principally among them, "the doctrine must be cautiously invoked, and the mere fact that a case touches on the political process does not necessarily create a political question beyond courts' jurisdiction." *In re Nazi Era Cases Against German Defendants Litig.*, 129 F.Supp.2d 370, 374 (D.N.J.2001) *(citing Nixon v. Herndon*, 273 U.S. 536, 540, 47 S.Ct. 446, 71 L.Ed. 759 (1927)). The Supreme Court recently restated the six independent tests courts use to identify the existence of a political question:

■ a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Vieth v. Jubelirer*, 541 U.S. 267, 277–78, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). "The tests are probably listed in descending order of both importance and certainty." *Id.* The Court need find only that a case fails one test to determine that the case is nonjusticiable. *See Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C.Cir.2005).

The scope and operation of these factors is not self-evident from the language used by the Supreme Court. Rather, the only

way to delineate the intended parameters of the political question doctrine is to examine the context in which it has been used, as it is a doctrine of limited application. As the Supreme Court stated in *Baker v. Carr*, the determination of whether a political question exists is "a delicate exercise in constitutional interpretation" that must be conducted on a "case-by-case inquiry." 369 U.S. at 211, 82 S.Ct. 691. The Court must "analyze representative cases and ... infer from them the analytical threads that make up the political question doctrine." *Id.* In doing so, the Court must not forget that it is a doctrine to be cautiously invoked only for "political questions," not simply for "political cases." *Id.* at 217, 82 S.Ct. 691.

The first *Baker v. Carr* test is the clearest statement of the six. It also has been held to be the most important because it most closely fits the doctrine's intention of protecting the political branches from judicial interference. *Saldano v. O'Connell*, 322 F.3d 365, 369 (5th Cir.2003) ("The dominant consideration in any political question inquiry is whether there is a textually demonstrable constitutional commitment of the issue to a coordinate political department.") (citing *Nixon v. United States*, 506 U.S. 224, 252–53, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993)) (Souter, J., concurring). The Supreme Court, as well as lower courts, have applied the first test in several different contexts.

For example, the Court has found nonjusticiable controversies arising under Congress's impeachment power. In *Nixon v. United States*, a federal judge who was convicted of making false statements and refused to resign despite being sentenced to prison was impeached by the House of Representatives. 506 U.S. 224, 226, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993). After reviewing evidence collected by a Senate committee, the Senate convicted the judge on two articles of impeachment by more than the required two-thirds majority. *Id.* at 229, 113 S.Ct. 732. Stripped of his office, the judge sued for a declaratory judgment to void his removal on the grounds that the impeachment proceedings employed by the Senate violated "the constitutional grant of authority to the Senate to 'try' all impeachments...." [2] *Id.* The Supreme Court declined the opportunity to rule on this and any future impeachment controversies, citing the political question doctrine: "Judicial involvement in impeachment proceedings, even if only for purposes of judicial review, is counterintuitive because it would eviscerate the 'important constitutional check' placed on the Judiciary by the Framers." *Id.* at 235, 113 S.Ct. 732. The Court found a constitutional commitment of impeachment procedures to the legislative branch.

Courts have invoked the first prong of the *Baker v. Carr* test to hold claims that implicate foreign affairs nonjusticiable under the political question doctrine. As the District of Columbia Circuit recently stated: "[D]ecision-making in the fields of foreign policy and national security is textually committed to the political branches of government." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C.Cir.2005); *see also Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (finding nonjusticiable a suit by members of Congress challenging the President's power to determine how to terminate a treaty with

---

**2.** Specifically, Article I, Section 3, Clause 6, which reads: "The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present."

Taiwan because the suit touched upon foreign relations). As an example, citing this traditional deference to the executive and legislative branches on foreign affairs, courts have consistently deemed suits seeking reparations from former enemies of the United States, most notably Germany and Japan, nonjusticiable as political questions best left to the political branches. *See, e.g., In re Nazi Era Cases Against German Defendants Litig.*, 129 F.Supp.2d 370 (D.N.J.2001); *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424 (D.N.J. 1999); *Burger–Fischer v. Degussa AG*, 65 F.Supp.2d 248 (D.N.J.1999). As the court in *Iwanowa* stated:

> [T]he most appropriate case for applicability of the political doctrine concerns the conduct of foreign affairs.... Such decisions are wholly confined by our Constitution to the political departments of the government, Executive or Legislative. They are delicate, complex, and involve large elements of prophecy.... They are decisions of a kind for which the Judiciary has neither aptitude, facilities now responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

67 F.Supp.2d at 484.

Here, the defendants do not contend, and the Court does not find, that there is a textually demonstrable commitment of coastal erosion questions to a coordinate political department.[3] The defendants do

argue that the case at hand implicates the second prong of the *Baker v. Carr* test because there are a lack of judicially manageable standards for the Court to use in this matter. The cases in which the second prong of the *Baker v. Carr* test has been invoked to find claims nonjusticiable do not support plaintiffs' argument.

The Supreme Court has consistently recognized that cases brought under the Guaranty Clause, in which the United States guarantees every state a republican form of government, are judicially unmanageable.[4] The Supreme Court first determined that claims under the Guaranty Clause were nonjusticiable in *Luther v. Borden*, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849). There, a dispute between two groups that each laid claim to being the official government of Rhode Island in the early 1840s provided the factual backdrop to the case. As the Court in *Baker v. Carr* summarized, when the Court declared claims made by the plaintiff in *Luther* nonjusticiable, it determined that

> the Guaranty Clause is not a repository of judicially manageable standards which a court could utilize independently in order to identify a State's lawful government. The Court has since refused to resort to the Guaranty Clause ... as the source of a constitutional standard for invalidating state action.

369 U.S. at 223, 82 S.Ct. 691 (citing numerous cases in which the Court has deemed

---

**3.** It is worth noting here, however, that the defendants argue that a resolution in favor of the plaintiffs could force oil and gas companies to cease exploration and production off the Louisiana coast, thus threatening the nation's energy supply, and hence affecting its foreign policy interests—an area textually committed to the political branches. This somewhat overwrought argument rests on many unarticulated assumptions, which convinces the Court that the relationship between these claims and United States foreign policy

is too attenuated to implicate the political question doctrine.

**4.** The Guaranty Clause reads: "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. Const. Art. IV, § 4.

Guaranty Clause claims nonjusticiable). The Court also has held that "challenges to congressional action on the ground of inconsistency with that clause present no justiciable question." *Id.* at 224, 82 S.Ct. 691.

Additionally, several circuits, including the Fifth Circuit, have found that claims under the naturalization clause, under which Congress has the power "to establish a uniform Rule of Naturalization," are nonjusticiable because of the absence of any judicially manageable standards to determine the constitutionality of Congressional immigration efforts.[5] *See Texas v. United States,* 106 F.3d 661 (5th Cir.1997); *see also* U.S. Const. Art. I, Sect. 8, Cl. 4. In *Texas v. United States,* the state of Texas sued the federal government alleging that failed immigration policies had forced the state to incur extra expenditures on illegal immigrants that should be borne instead by the federal government. Citing the Supreme Court's holding in *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), that the legislative power is most complete over immigration policy, the Fifth Circuit stated: "Courts must give special deference to congressional and executive branch policy choices pertaining to immigration." *Texas,* 106 F.3d at 665.

The Second Circuit and the District of Columbia Circuit likewise have found suits challenging United States military policies as they apply to foreign countries nonjusticiable under the second prong of the *Baker v. Carr* test. *See, e.g., Crockett v. Reagan,* 720 F.2d 1355 (D.C.Cir.1983) (finding nonjusticiable a claim that military aid to El Salvador violated the war powers clause of the Constitution); *DaCosta v. Laird,* 471 F.2d 1146 (2d Cir.1973) (holding that a suit against the President for illegally authoriz-

ing military action was nonjusticiable); *see also Greenham Women Against Cruise Missiles v. Reagan,* 591 F.Supp. 1332 (S.D.N.Y.1984) (declaring nonjusticiable a suit seeking an injunction against the deployment of cruise missiles in an English town).

In fact, the Supreme Court's recent division over whether to invoke the "lack of judicially manageable standards" factor to hold political gerrymandering claims nonjusticiable supports a limited application of this prong of the justiciability test. *See Vieth,* 541 U.S. 267, 124 S.Ct. 1769, 158 L.Ed.2d 546. In *Vieth,* Justice Scalia, writing for a four-justice plurality, reviewed the lengthy history of Supreme Court political gerrymandering cases, and concluded that the Supreme Court has been unable to find any judicially manageable standards for handling these types of claims. *Id.* at 281, 124 S.Ct. 1769. As a result, Justice Scalia determined that political gerrymandering cases fail the second prong of the *Baker v. Carr* test, and thus are nonjusticiable political questions. Justice Kennedy, acknowledging the current absence of workable standards in these cases, concurred in the judgment, but he refused to rule out the possibility of judicially manageable standards emerging in the future to guide the Supreme Court in political gerrymandering cases. *Id.* at 317, 124 S.Ct. 1769 (Kennedy, J., concurring). He thus joined with the four-justice minority in refusing to hold all future political gerrymandering cases nonjusticiable. *Id.* (Stevens, J., dissenting) ("The central question presented by this case is whether political gerrymandering claims are justiciable.... [F]ive Members of the Court are convinced that the plurality's answer to that question is erroneous.").

---

**5.** The naturalization clause reads: Congress "shall have Power ... To establish an uni-

form Rule of Naturalization." Art. I, Sect. 8, Cl. 4.

It is significant then that, in light of courts' limited application of the second prong of the *Baker v. Carr* test, plaintiffs' claims do not fall into any of the categories discussed above in which courts have invoked this factor. In fact, the case most analogous to this one is *Gordon v. Texas,* 153 F.3d 190, 195 (5th Cir.1998), in which the Fifth Circuit expressly held that coastal erosion is not an area in which courts are unable to determine judicially manageable standards. In that case, beachfront property owners sued both state and private entities alleging that a fish pass contributed to coastal erosion problems. *Id.* at 192. The Fifth Circuit reversed the district court's decision that dismissed the plaintiffs' claims for injunctive and monetary relief on political question grounds, permitting both claims to go forward. The facts in that case are similar to the ones at issue here in several significant ways. First, the fish pass in *Gordon* was constructed and operated by state and private entities with the permission of the United States Army Corps of Engineers. *Id.* The canals that are the subjects of the plaintiffs' claims were also built and maintained with the permission of the Corps. (Def.'s Memo. in Support of Mot. to Dismiss at p. 12). Second, in both cases, the timeframe during which the alleged tortious conduct took place spanned several decades. In *Gordon,* the fish pass had operated continuously from 1959 up until the plaintiffs' suit was initiated in 1996. 153 F.3d at 192. Here, the Corps has granted permits for the canals at issue for at least the past four decades. (Def.'s Memo. in Support of Mot. to Dismiss, at p. 12). Third, plaintiffs in both actions did not request that any action be taken by any part of the federal government. Fourth, reports by the Corps concluded that the fish pass had contributed to the exact problem contemplated by the plaintiffs' suit—coastal erosion. *See Gordon,* 153 F.3d at 192.

The court in *Gordon* found that the pleadings "do not now create a conflict with the federal government, and we refuse to speculate that one will arise in the future." 153 F.3d at 195. Furthermore, the court there held: "There is nothing inherent in erosion claims making them difficult to manage judicially; the district court need only determine the existence of liability and, if necessary, the extent of damages." *Id.* Given the factual similarities between *Gordon* and the case at hand, the *Gordon* decision guides the Court in this case. That this tort suit would likely affect more people than the suit in *Gordon* should not change the analysis employed by the Fifth Circuit.

■ Furthermore, the Supreme Court has never applied the "lack of judicially manageable standards" prong to a dispute between private parties. As previously discussed, the plaintiffs have brought a suit in tort under Louisiana Civil Code articles 667, 2315, and 2317 against oil and gas pipeline and exploration/production companies with operations along the Louisiana coastline. The complaint alleges that the defendants' activities were the cause of the destruction of the coastal marshlands, which directly led to loss of life and property damage from Hurricane Katrina. The plaintiffs' action then is nothing more than a tort suit under Louisiana law. That law provides judicially manageable standards under which plaintiffs' claims can be evaluated. *See* discussion *infra.* As the Tenth Circuit has stated, "the political question theory and the separation of powers doctrines do not ordinarily prevent individual tort recoveries." *McKay v. United States,* 703 F.2d 464, 470 (10th Cir.1983). In holding that a suit against the Palestine Liberation Organization for damages arising from a hijacking operation did not trigger the political question doctrine, the Second Circuit stated,

"[B]ecause the common law of tort provides clear and well-settled rules on which the district court can easily rely, this case does not require the court to render a decision in the absence of 'judicially discoverable and manageable standards.'" *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir.1991). In *Klinghoffer*, the Second Circuit was "faced with an ordinary tort suit, alleging that the defendants breached a duty of care owed to the plaintiffs or their decedents." *Id.* As a result, the court concluded, "The department to whom this issue has been 'constitutionally committed' is none other than our own—the Judiciary." *Id.* Similarly, the Ninth Circuit in *Koohi v. United States*, a tort suit for damages from the shooting of an Iranian airliner by a United States warship, declared that "federal courts are competent to determine both the merits of the plaintiffs' suit and the extent of the relief to which plaintiffs would be entitled." 976 F.2d 1328, 1332 (9th Cir.1992). Significantly, the Second Circuit noted that "a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question." *Klinghoffer*, 937 F.2d at 49. Here, that the plaintiffs' suit arises from one of the costliest and deadliest natural disasters in this nation's history should not obscure the allegations in tort at the heart of the plaintiffs' claims.

Finally, the nature of the relief sought by the plaintiffs in this action supports a determination that this suit does not fall under the second prong of the political question test. Plaintiffs seek monetary damages as compensation for the loss of life and destruction of property caused by the defendants' oil and gas operations along the Louisiana coast. They seek no injunctive relief. The Fifth Circuit has found this distinction important in the consideration of potential political questions. *See Gordon*, 153 F.3d at 195. "Indeed, as compared to injunctive relief, requests for monetary damages are less likely to raise political questions. Monetary damages might but typically do not require courts to dictate policy to federal agencies, nor do they constitute a form of relief that is not judicially manageable." *Id.* On the other hand, "requests for injunctive relief can be particularly susceptible to justiciability problems, for they have the potential to force one branch of government—the judiciary—to intrude into the decision-making properly the domain of another branch—the executive." *Id.* at 194. Other circuits have held plaintiffs' actions that sought damages, but not injunctive relief, justiciable because of the nature of the relief sought. As the Ninth Circuit has stated, actions seeking only damages are "particularly judicially manageable" and "particularly non-intrusive." *Koohi*, 976 F.2d at 1332 ("By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions."); *see also McKay*, 703 F.2d 464 (holding that a suit in tort brought by injured individuals seeking damages was not barred by the political question doctrine). Defendants argue that the plaintiffs' request for the defendants to be liable for all costs of restoration of the coastal marches is tantamount to a request for injunctive relief. However, the cost to restore the wetlands is an item of damages in this lawsuit, and is not a request for injunctive relief. As such, the Court does not find that the plaintiffs' claims implicate the second prong of the political question doctrine as set forth in *Baker v. Carr*.

The case that the defendants cite as most analogous to the one here, *Connecticut v. American Electric Power Co.*, 406 F.Supp.2d 265 (S.D.N.Y.2005), is distin-

guishable because of the distinction between monetary damages and injunctive relief in the context of the justiciability of political questions. In that case, the plaintiffs, various states and non-profit land trusts, brought public nuisance actions against several public utilities seeking to enjoin the defendants to cap their carbon dioxide emissions and to reduce their amount of emissions by a specified percentage each year. The suit was an effort to address the issue of global warming going forward, and thus the plaintiffs sought only injunctive relief. The court called the relief desired by the plaintiffs "transcendently legislative" in nature, and stated:

> Such relief would, at a minimum, require this Court to: (1) determine the appropriate level at which to cap the carbon dioxide emissions of these Defendants; (2) determine the appropriate percentage reduction to impose upon Defendants; (3) create a schedule to implement those reductions; (4) determine and balance the implications of such relief on the United States' ongoing negotiations with other nations concerning global climate change; (5) assess and measure available alternative energy resources; and (6) determine and balance the implications of such relief on the United States' energy sufficiency and thus its national security—all without an 'initial policy determination' having been made by the elected branches.

*Id.* at 272–73. Conversely, the claims made by the plaintiffs in this case will not require such extensive policy determinations as the plaintiffs have requested no injunctive relief. Furthermore, the claims in *American Electric Power* were not based on negligence, an important distinction from the claims at issue here.

In addition, to the extent that the defendants cite to the World War II reparations cases to support their contention that there are a lack of judicially manageable standards here, those cases are easily distinguishable. They were deemed nonjusticiable because they affected the conduct of the nation's foreign affairs. The district court in *Iwanowa* stated: "In 1953, the executive branch declared that 'reparation and other governmental claims relating to World Wars I and II should more appropriately be dealt with in the context of a peace treaty or similar arrangement.'" 67 F.Supp.2d at 486 (quoting *Letter from Secretary of State John Foster Dulles to President Eisenhower of April 4, 1953*, 83rd Cong., 1st Sess. 205 (1953)). As a result, "this Court's resolution of forced labor claims would inevitably undermine our executive branch's authority in foreign affairs." *Id.* at 487. *See also In re Nazi Era Cases Against German Defendants Litig.*, 129 F.Supp.2d at 383 ("If this Court were to allow Mr. Frumkin's claims to proceed to trial, it would unacceptably intrude into the foreign policy determinations of our government."). As the plaintiffs present no issues that touch upon the political branches' responsibility for foreign relations, the World War II cases are inapplicable here.

Defendants also assert that any decision by the Court will necessarily require that the Court make an "initial policy determination" that is best left to the other branches of government under the third prong in *Baker v. Carr*. Defendants point to the fact that development in the Louisiana marshlands implicates energy policy, economic development, and environmental protection, such that the Court would have to make an initial assessment as to the proper balance to strike between these considerations and the tort remedies that plaintiffs seek. However, the case law cited above shows that the plaintiffs' claims do not implicate this prong because an initial policy determination is unneces-

sary when there are judicially manageable standards to guide the Court's decision. Here, the Court need only look to Louisiana tort law to decide this case.

The final three components of the *Baker v. Carr* test are interrelated, as they apply when a coordinate branch of government has already acted in an area within its purview and thus any judicial action could conflict with or undermine that executive or legislative decision-making. These prongs are most commonly invoked in reparations cases. For example, a district court recently used the rationale behind these three prongs to dismiss a class action suit against several companies seeking reparations for the enslavement of African–Americans. *See In re African–American Slave Descendants Litig.,* 375 F.Supp.2d 721 (N.D.Ill.2005). In that case, the plaintiffs sought an accounting of and disgorgement of profits earned either directly or indirectly by the predecessors of the 17 named defendant companies as a result of slavery. *Id.* at 737. The plaintiffs also sought a commission to study the defendants' business dealings, restitution, and compensatory and punitive damages. *Id.* The lawsuit applied mainly to conduct between 1619 and 1865. The court found that the issue of slavery reparations was one that had already been addressed several times by Congress, especially in the period right after the end of the Civil War. Furthermore, the court concluded that the issue fell under the political branches' war powers, since it was so intertwined with both the prosecution and resolution of the conflict. "By requiring the court to second-guess the decisions of the Representative Branches made more than a century ago, Plaintiffs' Complaint presents a nonjusticiable political question." *Id.* at 762.

Unlike the issue of slave reparations, the federal government has not addressed compensation to Louisiana property owners by the named oil and gas companies in the wake of Hurricane Katrina. The court in *African–American Slave Descendants Litigation* provides a lengthy history of Congressional efforts to provide reparations to freed slaves both immediately in the aftermath of the Civil War, and throughout the past century and a half. *See Id.* at 758–62. By contrast, the representative branches have not yet grappled with the claims at issue in this case. The Court would not fly in the face of a historical commitment of the issue to the executive and legislative branches by addressing the plaintiffs' claims.

Defendants also argue that, given the history of federal involvement in the dredging of canals in Louisiana's marshlands, any judicial pronouncement in this case would conflict with and undermine federal policymaking in this area. It is without argument that the federal government has played and continues to play a role in the management of Louisiana's wetlands. The Rivers and Harbors Act of 1899, 33 U.S.C. § 401, *et seq.,* requires that any party seeking to dredge or alter a navigable canal receive a permit from the Army Corps of Engineers. *See* 33 U.S.C. § 403; *Bayou Des Familles Development Corp. v. U.S. Corps of Engineers,* 541 F.Supp. 1025, 1033–34 (E.D.La.1982) (holding that plaintiff's failure to obtain a permit from the Corps before blocking an artificial canal violated the RHA). The Corps, in evaluating any proposed canal projects, grants permission to perform such projects only when it concludes that the project is in the overall public interest. 33 C.F.R. § 320.4(a)(1) ("The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest."). The Corps is specifically required to consider "shore erosion and accretion" in evaluating such projects. *Id.*

Congress has also directed its attention to the problem of coastal wetland loss in Louisiana. In 1990, Congress passed the Coastal Wetlands Planning Protection and Restoration Act, commonly referred to as the Breaux Act. *See* 16 U.S.C. § 3951 *et seq.* The Breaux Act established a task force to develop "a comprehensive approach to restore and prevent the loss of coastal wetlands in Louisiana." 16 U.S.C. § 3952(b)(2). The task force published an initial plan in 1993, and in 1998 it published the Coast 2050 plan, in conjunction with the state of Louisiana. *See* Louisiana Coastal Wetlands Conservation and Restoration Task Force and the Wetlands Conservation and Restoration Authority, Coast 2050: Toward a Sustainable Coastal Louisiana (1998). The Coast 2050 plan is directed at the problem of land loss along Louisiana's coast, and it aims to set a long-term management strategy for the region. *Id.* at 2. In 2004, the Corps published its own comprehensive coastal restoration strategy, as part of the Louisiana Coastal Area Restoration Study. U.S. Army Corps of Engineers, New Orleans District, Louisiana Coastal Area (LCA), Louisiana, Ecosystem Restoration Study I (November 2004). Ultimately, the study recommended $2 billion in projects aimed at wetlands restoration. *Id.* at xv.

The Breaux Act task force and the recent Corps of Engineers study certainly indicate a level of federal interest in the general issue of Louisiana's coastal wetlands. But for the purposes of the political question doctrine, these efforts do not evince the kind of serious federal policy-making that would warrant this Court's abstaining from its ordinary adjudicative role. First, Congress passed no prescriptive legislation on the coastal erosion issue, and none of the federal activities that the defendants refer to involve the implementation of prescriptive legislation aimed at the Louisiana wetlands. It is true that several departments of the federal government are actively studying what to do in the future about the coastal erosion problem in Louisiana, possibly with an eye toward suggesting legislation. But these studies have yet to mandate that either the federal government or the oil and gas pipeline and exploration/production companies who are defendants in this lawsuit take any action aimed at past damages to the coastal wetlands. These studies do not even mention the names of the oil and gas companies. Furthermore, these studies do not address the companies' liability to the plaintiffs in this action. The Court thus concludes that the mere fact that the government has studied the issue of coastal wetlands loss in Louisiana creates no conflict with judicial involvement in this lawsuit, such that it merits application of the political question doctrine.

In addition, the Fifth Circuit has already held that a government-regulated permit system does not preclude a private claim based on coastal erosion. *See Gordon,* 153 F.3d at 194–95. There, even though the federal government had originally granted the permit that allowed the dredging at issue, the Fifth Circuit could not conclude that acting to stop the alleged erosion conflicted with federal policy. *Id.* Additionally, plaintiffs' claims here go beyond the initial permits granted to the defendants. The plaintiffs allege that the defendant companies failed to maintain their pipeline canals properly. The plaintiffs are not merely challenging the permit process itself.

The Court is aware that from the face of the plaintiffs' complaint this could be a complex case to adjudicate. But that does not necessarily turn the plaintiffs' lawsuit into a nonjusticiable political question. The Court does not find that the plaintiffs' claims implicate the political question doctrine as set forth in *Baker v. Carr.* To hold

otherwise would constitute an unnecessary and improper expansion of a doctrine that has always had limited application in our judicial system.

## B. Failure to State a Claim

### 1. *Applying Louisiana Law*

■ When a federal court interprets a Louisiana statute, it must do so according to the principles of interpretation followed by Louisiana courts. *Gen. Elec. Capital Corp. v. Se. Health Care, Inc.,* 950 F.2d 944, 950 (5th Cir.1991). In Louisiana, the sources of law are legislation and custom. *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.,* 395 F.3d 533, 546 (5th Cir.2004). These authoritative or primary sources of law are to be "contrasted with persuasive or secondary sources of law, such as [Louisiana and other civil law] jurisprudence, doctrine, conventional usages, and equity, that may guide the court in reaching a decision in the absence of legislation and custom." *Id.* (quoting La. Civ.Code art. 1). In Louisiana, "courts must begin every legal analysis by examining primary sources of law: the State's Constitution, codes, and statutes." *Id.* (*quoting Prytania Park Hotel, Ltd. v. General Star Indem. Co.,* 179 F.3d 169, 174 (5th Cir.1999)). To make an 'Erie guess' on an issue of Louisiana law, the Court must "employ the appropriate Louisiana methodology" to decide the issue the way that it believes the Supreme Court of Louisiana would decide it. *Id.* (*quoting Lake Charles Diesel, Inc. v. Gen. Motors Corp.,* 328 F.3d 192, 197 (5th Cir.2003)).

### 2. *Legal Analysis*

Plaintiffs assert that they are entitled to recovery under Louisiana Civil Code articles 667, 2315, and 2317. Defendants assert that Louisiana law does not support recovery under any of these statutes.

#### a. Recovery under Article 667

■ Article 667 of Louisiana's Civil Code provides as follows:

Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case. Nonetheless, the proprietor is answerable for damages without regard to his knowledge or his exercise of reasonable care, if the damage is caused by an ultrahazardous activity. An ultrahazardous activity as used in this Article is strictly limited to pile driving or blasting with explosives.

La. Civ.Code art. 667. Strict liability under the statute, in its modern incarnation, is limited to the "ultrahazardous activities" of pile driving or blasting with explosives; otherwise liability requires a showing of negligence. *Suire v. Lafayette City–Parish Consol. Gov't,* 907 So.2d 37, 48 (La. 2005). Even under its earlier form, which did not limit strict liability to actions involving ultrahazardous activities, the article still required proof of both damage and causation to establish liability. *Butler v. Baber,* 529 So.2d 374, 381 (La.1988). Causation under Article 667 must be a cause in fact, which means that "it must have a proximate relation to the harm which oc-

curs, and it must be substantial in character." *Id.* at 378.

 The statute creates an "obligation of vicinage, a limitation on the use of property." *Id.* at 377. The statute applies only in the case of damage done to neighbors. *Id.* at 381 ("Fault under 667 is the damage done to neighboring property . . . ."); *see also Hero Lands Co. v. Texaco, Inc.,* 310 So.2d 93, 97 (La.1972) ("[Article 667] is a species of legal servitude in favor of neighboring property. . . ."). It has been used to create obligations between owners of adjacent properties, or properties that lay physically close to one another. *Inabnet v. Exxon Corp.,* 642 So.2d 1243, 1251 (La.1994) ("The courts have referred to Articles 667–669 to determine the conduct which constitutes 'fault' under Article 2315 in the context of neighboring proprietors."); *see also Robichaux v. Huppenbauer,* 258 La. 139, 245 So.2d 385 (1971) (owner of a horse stable could be enjoined from operation because "noxious and offensive vapors . . . diffuse themselves over the adjoining residential property"); *Chaney v. Travelers Ins. Co.,* 259 La. 1, 249 So.2d 181 (1971) (parish liable to homeowner for damage done to his home by vibration from heavy equipment used in canal digging nearby). The Court finds that the definition of "neighbor" under Article 667 does not contemplate the relationship plaintiffs assert. Plaintiffs ask for a finding of liability between parties whose properties are hundreds of miles apart in many cases. If these parties could be held to be neighbors, the restrictive meaning of the statutory language would be eviscerated. Louisiana Civil Code article 11 requires courts, when interpreting the meaning of statutes, to give the words "their generally prevailing meaning." Plaintiffs have not suggested, and the Court is not aware of, any generally prevailing meaning of "neighbor" that could possibly apply to the relationship between a homeowner in

Iberia Parish and an exploration company that dug a canal near the mouth of the Mississippi River.

The cases plaintiffs cite are unconvincing, because they all deal with relationships between property owners that are characterized by proximity. *See, e.g., Butler,* 529 So.2d 374 (oyster lessees could maintain action under Article 667 against mineral lessees whose dredging activities damaged plaintiffs' oyster beds); *Lombard v. Sewerage and Water Bd. of New Orleans,* 284 So.2d 905 (La.1973) (plaintiffs could maintain action against a construction company whose activity while installing a drainage canal damaged homes immediately adjacent to the route of the canal); *Caldwell Country Club v. Dep't of Transp. and Dev.,* 438 So.2d 723 (La.Ct. App.1983) (state agency's actions while excavating a creek caused excessive silt to be deposited on a neighboring golf course when it flooded, supporting recovery). Plaintiffs' Article 667 claim fails because they do not demonstrate that the "neighbor" referred to in Article 667 could be a party whose property is physically remote from that of the defendants. Moreover, as discussed *infra,* plaintiffs have not alleged that any individual defendant's actions were a cause-in-fact of any individual plaintiff's harms, further precluding recovery under Article 667.

#### b. Recovery under Article 2315

 Article 2315 of the Louisiana Civil Code provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." This statute provides the basis for negligence liability in Louisiana. Literally interpreted, Article 2315 could hold a tortfeasor liable for any damage remotely caused by his or her fault. Louisiana courts have established limitations on the extent of damages for which a tortfeasor

can be held liable in the duty portion of the duty-risk analysis used to determine liability under Article 2315. *Severn Place Assoc. v. Am. Bldg. Serv., Inc.*, 930 So.2d 125, 127 (La.Ct.App.2006) *(quoting La. Swabbing Serv., Inc. v. Enter. Prods. Co.*, 784 So.2d 862 (La.Ct.App.2001)); *see also Todd v. State*, 699 So.2d 35, 39 (La.1997) ("Nevertheless, the extent of protection owed a particular plaintiff is determined on a case-to-case basis to avoid making a defendant an insurer of all persons against all harms."). A duty-risk analysis involves five elements which must be proved by the plaintiff: (1) proof that the defendant had a duty to conform his conduct to a specific standard; (2) proof that the defendant's conduct failed to conform to the appropriate standard; (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) proof of actual damages. *Long v. State ex rel. Dept. of Transp. and Dev.*, 916 So.2d 87, 101 (La.2005). The Court finds that plaintiffs will be unable to establish that defendants owed them a duty or that defendants' conduct was a cause-in-fact of their injuries.

#### i. Duty

■ The existence of a duty is a question of law, as is the question of whether a specific risk is included within the scope of the duty owed. *Ellison v. Conoco, Inc.*, 950 F.2d 1196, 1205 (5th Cir.1992). Nevertheless, "[t]here is no 'rule' for determining the scope of the duty." *Roberts v. Benoit*, 605 So.2d 1032, 1044 (La.1991). That inquiry typically requires consideration of the facts of each case, and dismissal is therefore proper "only where no duty exists as a matter of law and no factual or credibility disputes exist." *Parish v. L.M. Daigle Oil Co.*, 742 So.2d 18, 25 (La.Ct. App.1999).

Defendants assert that plaintiffs have no basis in Louisiana law to assert that defendants owed a duty to protect them from damage caused by hurricanes. Plaintiffs respond that because the legal scope of duty is fact sensitive, it would be inappropriate for the Court to rule on whether defendants had the duty to protect plaintiffs from this particular harm. However, the Court credits plaintiffs' version of the facts at this stage, awarding them the benefit of the doubt as to any issues of fact or credibility. Plaintiffs do not point to any statute or case imposing a duty in this context, nor do they state what duty or duties to them might have been breached by defendants.

The Louisiana Supreme Court has never imposed a duty of this scope in any case that the Court could find. By contrast, in the closest case to the issue at hand, the Louisiana Supreme Court refused to imply a duty to restore coastal wetlands in a two-party mineral lease. *See Terrebonne Parish School Bd. v. Castex Energy, Inc.*, 893 So.2d 789 (La.2005). Tellingly for this Court, the plaintiffs in that case had more ammunition to support a duty than plaintiffs do here. In *Terrebonne Parish*, the School Board granted an exclusive oil and mineral lease in 1963 covering a section of coastal marshland. *Id.* at 792. Among the rights granted to the lessee in the contract was the right to dredge canals. *Id.* Over the years, the rights under the mineral lease were assigned to several companies until the lease terminated around the beginning of 1997. *Id.* at 793. In 1999, the School Board filed suit alleging that through the defendant operators' exploration activities, particularly the dredging of canals, the area to which the lease applied lost more than 27 acres of coastal marshland. *Id.* The School Board claimed that the defendants had a duty under Mineral Code article 122, which deals with a miner-

al lessee's duty to act as a prudent operator, to restore the wetlands to their original condition, even though no such duty was expressly written into the mineral lease. *Id.* Article 122 provides:

A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.

La.Rev.Stat. § 31:122. The Official Comment to Article 122 states that there appears to be no reason why an implied duty to restore the surface should be excluded "as being a specification of the prudent administrator standard." Comment, La.Rev.Stat. § 31:122. The Comment further cites Louisiana Civil Code articles 2719 and 2720 as sources of such an implied duty, as well as Louisiana case law. *See* La. Civ.Code arts. 2719, 2720 (requiring lessees to return premises as nearly as possible to their original condition); *see also Wemple v. Pasadena Petroleum Co.*, 147 La. 532, 85 So. 230 (1920); *Rohner v. Austral Oil Exploration Co.*, 104 So.2d 253 (La.Ct.App.1958); *Smith v. Schuster*, 66 So.2d 430 (La.Ct. App.1953). The Louisiana Supreme Court nevertheless declined to imply that the defendants had a general duty to restore the surface of the leased property to its pre-lease condition. First, the Court noted that Mineral Code article 122 does not expressly impose such an obligation upon mineral lessees. *Id.* at 797. The Court then examined lower court decisions and found that, in the absence of an express lease provision, a lessee's duty to restore the surface was limited "to those circumstances where a mineral lessee has exercised his rights under the lease unreasonably." *Id.* at 799. The Court further

held that the dredging of the canals was not an unreasonable use because the School Board gave permission to dredge the canals under the terms of the mineral lease. *Id.* at 800.

■ The case at hand presents a far less compelling case for imposing a duty to restore the wetlands on oil and gas pipeline and exploration companies than did *Terrebonne Parish*. In *Terrebonne Parish*, there were existing duties between the parties that could have supplied the basis for an implied duty. Here, unlike in *Terrebonne Parish*, the party claiming to be owed a duty was never in a contractual relationship with the defendants concerning the wetlands, which could have served as a platform for implying a duty. Moreover, plaintiffs' claims are more attenuated because they are suing for hurricane damage from storm surge allegedly magnified by coastal erosion caused by the canals, not for a direct loss of acreage due to erosion. Further, in *Terrebonne Parish*, there was a statutory basis and case law that the court could have used to imply a duty, both of which are absent here. The duty of a mineral lessee to act as a prudent operator on specific property *vis à vis* a specific lessor, together with the Civil Code requirements that lessees generally restore the premises upon termination of the lease, provide a much firmer basis on which to imply a duty than the general pronouncement of Article 2315 that a tortfeasor is liable for any damage caused by his or her fault. If the Louisiana Supreme Court refused to read an implied duty to restore the surface on the facts of *Terrebonne Parish*, it would almost certainly decline to do so when remote parties seek to impose a general duty that has no basis in their relationship or controlling law.

Plaintiffs cite a number of cases purporting to establish that courts applying Louisiana law have found a duty in similar

cases. In *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 772 F.2d 1217 (5th Cir.1985), the Fifth Circuit reversed a trial court's ruling that prevented the owner of an aluminum plant from bringing a claim for damages under Article 2315 against the owner of a dredge that ruptured a pipeline that supplied the plant with natural gas. The trial court applied case law to the effect that a party may not recover purely economic losses for negligent interference with its contract. The trial court relied on *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), which stands generally for the proposition that "recovery is barred to a plaintiff who asserts a claim for economic loss unaccompanied by physical damage to property in which the plaintiff has a proprietary interest." *Consolidated Aluminum Corp.*, 772 F.2d at 1218. The plant owner, however, sustained extensive physical damage to its property when natural gas was cut off. The Fifth Circuit found that the restriction against recovering economic losses did not apply when the property owner suffered physical damage to its property. *Id.* at 1222. Rather, traditional tort principles applied, and the Fifth Circuit remanded the case for the trial court to determine whether the plaintiff's damages were too remote under general tort principles. In *Hero Lands Co.*, the Louisiana Supreme Court held that a plaintiff could bring an action for nuisance and/or abuse of rights against the owner of a pipeline on land adjacent to plaintiff's land because the defendant was allegedly aware of the nuisance when it installed the pipeline. 310 So.2d at 98. Neither of these cases is remotely similar to the facts presented here, and they do not support the imposition of a duty in this context. Finally, plaintiffs rely on *Cooper v. La. Dept. of Public Works*, 870 So.2d 315 (La.Ct.App. 2004). In that case, the court found that plaintiffs could bring a claim against the Louisiana Department of Transportation and Development for interference with their natural servitudes of drainage when the United States constructed a series of locks and dams that flooded plaintiffs' property. *Id.* at 327. The plaintiffs sued DOTD on the theory that it had a contractual duty to provide the United States with the servitudes necessary to carry out its work. *Id.* The plaintiffs rely on *Cooper* to support an assertion that the assumption of contractual duties "creates a corollary or incidental tort duty in favor of third persons" not to exercise contractual rights in an unreasonable manner such that it causes property damages to third parties. This Court finds the result in *Cooper* a stretch and its reasoning forced. But even if the Court found *Cooper's* reasoning persuasive, it stands only for the proposition that the assumption of a contractual duty "may" create an incidental duty to third parties, not that it always does so. The facts in *Cooper* are not similar to those presented here.

For plaintiffs to recover in this matter, they must demonstrate as a matter of law that defendants had a duty to these hundreds of thousands of plaintiffs to protect them from the results of coastal erosion allegedly caused by operators that were physically and proximately remote from plaintiffs or their property. Because the Court finds no case assigning such a broad duty to a defendant under Louisiana law, it must decide the issue the way that it believes the Louisiana Supreme Court would decide it. Based on its recent holding in *Terrebonne Parish School Board*, this Court believes that the Louisiana Supreme Court would find that the defendants do not owe the plaintiffs a duty as a matter of law.

ii. Cause-in-fact

Defendants also argue that plaintiffs cannot show that their actions

were the "legal cause" of plaintiffs' harms. The Court will pretermit this argument because it finds that the plaintiffs cannot show the "cause-in-fact" element of the duty-risk analysis under operative Louisiana causation law. "Cause-in-fact usually is a 'but for' inquiry that tests whether the accident would or would not have happened but for the defendant's substandard conduct." *Boykin v. La. Transit Co., Inc.,* 707 So.2d 1225, 1230 (La.1998). When there are concurrent causes of an accident that would have nevertheless occurred absent one of the causes, the proper inquiry is whether the conduct was a substantial factor in causing the accident. *Id.* at n. 10. While this determination is usually left to the trier of fact, it is clear that plaintiffs seek to impose a theory of causation-in-fact that has been rejected by Louisiana's courts, as well as federal courts interpreting Louisiana law. Plaintiffs do not allege that the actions of any particular defendant were a substantial factor in causing the injuries suffered by any particular plaintiff, nor do they assert a causal connection linking a particular defendant's operations to a particular plaintiff's injury. Plaintiffs do not dispute this. Rather, they point to allegations that all of the defendants' activities caused all of the plaintiffs' damages. The plaintiffs number in the hundreds of thousands, and they live in 17 parishes across south Louisiana. The defendants' conduct took place in different areas of south Louisiana at different times over the course of several decades. Plaintiffs' theory is apparently some form of group liability. Plaintiffs apparently believe that suing defendants as a class can overcomes this defect. But plaintiffs cannot impose liability on a defendant absent a showing of individual causation. The Fifth Circuit has repeatedly rejected theories of group liability or market share liability. *See In re Fibreboard Corp.,* 893 F.2d 706, 710–11 (5th Cir.1990) (rejecting a proposed trial procedure that would impose group liability without individual determinations as to causation); *Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 316 (5th Cir.1998) (finding group determination of liability inappropriate when injuries took place "at widely different times and places"); *Jefferson v. Lead Indus. Ass'n, Inc.,* 106 F.3d 1245, 1247–48 (5th Cir.1997) (affirming dismissal of an action because Louisiana does not allow for market share liability in lieu of individual determinations of proximate cause). Indeed, plaintiffs cite *Cimino* even though its holding is unhelpful to their argument. The other cases plaintiffs cite are similarly inapposite. *See Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468 (5th Cir.1986) (allowing a classwide trial of certain common issues pertaining to numerous asbestos cases to be conducted simultaneously with a trial on individual issues); *Mahoney v. R.J. Reynolds Tobacco Co.,* 204 F.R.D. 150 (S.D.Iowa 2001) (refusing to certify a class of smokers because of factual variations among the plaintiffs, when claims turned on individual facts); *Thompson v. Am. Tobacco Co., Inc.,* 189 F.R.D. 544 (D.Minn.1999) (refusing to certify a class in which the definition did not allow for damages from personal injuries due to smoking, and in which the complaint was "riddled with individual questions"); *Dante v. Dow Corning Corp.,* 143 F.R.D. 136 (S.D.Ohio 1992) (certifying a class of persons who received silicone breast implants, and their spouses, when class membership only required that the plaintiff have received the implants from the defendant manufacturers, designers, and sellers). In all of the cases cited by plaintiffs, no court disregarded the requirement that individual defendants be given an individual hearing as to causation and damages, something that plaintiffs do not contemplate.

The Court has not found a controlling or persuasive case at all similar to that proposed by plaintiffs, in which a plaintiff could collect damages from an industry as a whole without demonstrating any individual connection between any single member of the industry and the plaintiff's harm, and in which liability would be assessed against industry defendants on a group liability theory. The court concludes that such cases do not exist because they would subvert the notion of causation that underlies the system of tort liability in Louisiana. *See Thompson v. Johns–Manville Sales Corp.,* 714 F.2d 581, 583 (5th Cir.1983) (holding that theories that dispense with proof of causation are "radical departures from traditional theories of tort liability" and are not recognized in Louisiana); *see also George v. Housing Authority of New Orleans,* 906 So.2d 1282, 1287 (La.Ct.App.2005) ("While market share liability is recognized by some jurisdictions, we find no Louisiana case law adopting it."). Plaintiffs thus fail to state a claim upon which the Court could possibly grant recovery.

### c. Article 2317

Article 2317 provides as follows:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.

La. Civ.Code art. 2317. The "modifications" to Article 2317 were made in Article 2317.1, which provides that:

The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

La. Civ.Code art. 2317.1. Before the passage of Article 2317.1 in 1996, Article 2317 provided for a form of strict liability, but the standard is now one of negligence for "things" in the custody of a defendant. *Mayeux v. Marmac Acquisition, L.L.C.,* 900 So.2d 976, 979 (La.Ct.App.2005). The parties disagree as to which version of the statute should apply in this instance, but in either case, an inability to show legal causation or cause-in-fact defeats liability. This is because the test for causation under Article 2317 is the same as under Article 2315. *See Jones v. City of New Orleans,* 840 So.2d 620, 625 (La.Ct.App. 2003); *Fowler v. State Farm Fire & Cas. Ins. Co.,* 485 So.2d 168, 170 (La.Ct.App. 1986) (holding that the causation requirement under Article 2317 is identical to that under Article 2315). Because the Court finds that plaintiffs' pleadings do not satisfy the cause-in-fact requirement under Louisiana law, Article 2317 does not provide a basis for liability.

## IV. CONCLUSION

By all accounts, coastal erosion is a serious problem in south Louisiana. If plaintiffs are right about the defendants' contribution to this development, perhaps a more focused, less ambitious lawsuit between parties who are proximate in time and space, with a less attenuated connection between the defendant's conduct and the plaintiff's loss, would be the way to test their theory. In the absence of such a case, for the foregoing reasons, the court finds that plaintiffs fail to state a claim upon which relief may be granted, and the Court thus GRANTS defendants' motion. Plaintiffs' claims are hereby DISMISSED.